**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**FLORENCE DIVISION**

| | | |
|---|---|---|
| Ralph John ("Trey") Fallows, III, | ) | **CASE NO. 4:19-cv-01182-JD** |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **DEFENDANTS' MEMORANDUM IN** |
| | ) | **SUPPORT OF MOTION FOR** |
| Coastal Carolina University, Michelyn | ) | **SUMMARY JUDGMENT** |
| Pylilo, individually, and Travis E. | ) | |
| Overton, individually, | ) | |
| | ) | |
| Defendants. | ) | |
| ———————————————————— | ) | |

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Coastal Carolina University ("CCU"), Michelyn Pylilo ("Pylilo"), and Travis E. Overton ("Overton") or collectively as ("Defendants"), hereby move for summary judgment with respect to all claims asserted by Plaintiff Ralph John (Trey) Fallows, III ("Plaintiff").

## <u>NATURE OF THE CASE</u>

This is a Title IX lawsuit emanating from allegations of sexual misconduct made by one CCU student (Jane Doe) against a fellow CCU student (Plaintiff). Jane Doe alleged that Plaintiff sexually assaulted her after the two had been drinking heavily at a fraternity party. CCU investigated Doe's allegations, and the Student Conduct Board, made up predominantly of men, found that Plaintiff committed sexual misconduct, in violation of CCU's Code of Student Conduct. After making this finding, the Student Conduct Board suspended Plaintiff from CCU for eighteen months.

Despite his admission that he has no evidence of male bias, Plaintiff nonetheless brings this Title IX lawsuit. Simply put, gender did not play a role in the investigatory process or subsequent hearing on the sexual misconduct allegations against Plaintiff. The Complaint

additionally sets forth causes of action for violation of Office of Civil Rights ("OCR") Rules, breach of contract, and violations of 42 U.S.C. § 1983. (*See* **Complaint, Document Entry #1**). As set forth below, each of these claims fail as a matter of law, and summary judgment should be granted in Defendants' favor as to all claims.

## STATEMENT OF FACTS

Plaintiff enrolled at CCU in August 2015 and completed three consecutive semesters, earning 48 credit hours. (**Fallows Dep. p. 7, 10**). While at CCU, Plaintiff was a member of the Sigma Phi Epsilon fraternity. (**Fallows Dep. p. 45-46**). On the night of April 22, 2017, Sigma Phi Epsilon hosted a party at a bar called Sharkey's in Myrtle Beach. (*Id.* **at p. 52**). Plaintiff's Big Brother in the fraternity ("Big Brother")[1] set him up on a blind date with Doe for the party. (*Id.* **at p. 68**). The fraternity hosted a "pre-party" gathering, prior to the event at Sharkey's, at a fraternity brother's home, which the fraternity brothers called "the Stables." (*Id.* **at p. 49-50**).

On his way to the Stables, Plaintiff picked-up Doe at her apartment at approximately 6:00 p.m.[2] (*Id.* **at p. 60**). Doe was already drinking "a mixed drink" when Plaintiff arrived. (**Fallows Dep. p. 60; DEF 653**). Both Plaintiff and Doe were minors at the time. (**Fallows Dep. p. 50-51, 65**). As soon as they arrived at the Stables, Big Brother provided Doe with a pre-made alcoholic drink, consisting of Malibu Rum and Gatorade. (**DEF 639**). Plaintiff saw Doe drink the mix of Malibu Rum and Gatorade along with "a couple of mixed vodka drinks." (**DEF 653**). After seeing the volume of alcohol consumed by Jane Doe, Plaintiff remarked, "wow, you can drink a lot." (**DEF 635**).

---

[1] Because of the Family Educational Rights and Privacy Act, no current or former students are named in this memorandum of law, with the exception of Plaintiff, who has elected to proceed in this lawsuit under his own name.
[2] Doe's apartment was located on CCU Campus.

After leaving the Stables, Plaintiff drove Doe to Lackey Chapel, where Plaintiff left his car and joined other fraternity members and their dates in taxis to Sharkey's around 7:30 p.m. (**Fallows Dep.; DEF 639, 653**). Jane Doe reported not remembering much of the taxi ride but remembering kissing Plaintiff during the ride. (**DEF 635**).

Plaintiff and Doe were separated from one another for an hour or two at Sharkey's. (**Fallows Dep. p. 64**). Plaintiff does not know whether Doe consumed more alcohol while he was separated from her. (**Fallows Dep. p. 65**). Four hours later, around 11:30 p.m., Plaintiff and Doe left Sharkey's, riding in a cab back to Lackey Chapel. (**DEF 653**). Once the two arrived at Lackey Chapel, Plaintiff drove Doe back to her apartment, and Doe invited Plaintiff to her room, which Plaintiff stated he took as an invitation to have sex. (**DEF 616**; **DEF 653**). Once inside the apartment, both of Doe's roommates, ("Roommate #1") and ("Roommate #2"), heard Doe enter, and Roommate #2 heard Doe loudly say, "My roommates aren't home." (**DEF 643, 649**). Roommate #2 believed Doe was intoxicated because she spoke so loudly. (***Id.***). Neither roommate heard Plaintiff, and both assumed Doe was talking on the phone when she made the statement. (***Id.***)

Once inside Doe's apartment, Plaintiff and Doe made their way to Doe's bedroom. While in her bedroom, Doe reports slipping in and out of consciousness, not being able to move, and having a limp body. (**DEF 633**). Plaintiff corroborates these allegations. Plaintiff acknowledges that when he was attempting to put his penis into her vagina, Doe did not say anything—she was quiet—and more than quiet, she was motionless. (**Fallows Dep. p. 144-45**). In Plaintiff's words, she was "still" and "just lying there." (**Fallows Dep. p. 145, 153**).

Before putting his penis into her, Plaintiff used his fingers to digitally penetrate Doe's vagina and butt. (**DEF 627, 635**). Plaintiff described it as "finger[ing] the shit out of her." (**DEF**

627). Then, while Doe was quiet and still, Plaintiff tried to put his penis into her. **(Fallows Dep. p. 145)**. He lifted her legs, putting both his hands on her hamstrings. (*Id.*). Ultimately, Plaintiff left bruises and scratches on Doe's legs **(DEF 634)**, and the next day, Jane Doe had red marks and scratches on her face. **(DEF 615-16, 806)**.

The combination of Plaintiff's fingers and/or penis left Doe bleeding from her vagina. **(DEF 627, 636)**. When Plaintiff saw the blood, he, in his own words, "ran away"—quickly putting on his clothes and leaving her apartment. **(DEF 692; Fallows Dep. pp. 99-100)**. The next day, Plaintiff bragged about his sexual encounter with Doe, texting his Big Brother the following: "I fucked [Jane Doe]," and "I fingered the shit out of her." **(DEF 623, 627; Fallows Dep. p. 86)**.

Immediately after Plaintiff left Doe's apartment, Doe collapsed and began crying, and she called a friend, ("Friend") around 12:30 a.m., and reported that she believed she had been raped. **(DEF 615)**. Friend then went to Doe's apartment and observed her to be intoxicated and "unsteady on her feet" and "swaying." **(DEF 647)**. Doe then cried for approximately 20-30 minutes. (*Id*). The next morning, on April 23, 2017, Doe went to the hospital with Friend, her Roommates, and her grandmother to seek treatment for the sexual assault. **(DEF 615)**.

Pictures are more compelling than words. When Doe arrived at the hospital, she presented with red marks and scratches on her face. **(DEF 615-16, 806)**. At the hospital, the sexual assault nurse examiner documented lacerations and scratches inside of Doe's vagina and on the inside and outside of her thighs. **(DEF 622)**. Conway Emergency Room reported the sexual assault to CCU around 3:00 p.m. on April 23, 2017, and Officer Pylilo, an investigator in CCU's Department of Public Safety, reported to the Emergency Room to conduct an initial investigation. **DEF 615)**. When Officer Pylilo spoke with Doe at the hospital, she observed an abrasion on Doe's upper lip as well as scratches and red marks on Doe's thighs. **(DEF 615; DEF 806-813)**.

Officer Pylilo also interviewed Friend and Roommate #1 separately while they were at the hospital. Friend confirmed arriving at Doe's apartment after she called and reported that she had been raped. **(DEF 615-16)**. Roommate #1 stated she had not heard anything out of the ordinary the night before, that she had gone to church that morning, and when she came home she observed Doe crying hysterically with visible injuries. **(DEF 616)**. Roommate #1 convinced Doe to go to the hospital. **(*Id.*)**.

On April 24, 2017, Officer Pylilo reviewed video footage from CCU's external cameras to capture the timeline of events. **(*Id.*)**. The following day, on April 25, 2017, Doe communicated that she wanted to press charges against Plaintiff. **(*Id.*)**. Officer Pylilo then interviewed Doe for a second time. Doe reported that she was very intoxicated during the incident in question. **(*Id.*)**. Doe reported that Plaintiff noticed she was intoxicated and said, "Wow you can drink a lot." **(*Id.*)**.

On April 25, 2017, Officer Pylilo interviewed Roommate #2 for the first time and interviewed Friend for the second time. **(DEF 617-18)**. Roommate #2 additionally confirmed that she saw the abrasion on Doe's lip and bruises and marks on Doe's thighs and neck, and that Doe was hysterical the morning after the incident. **(DEF 618)**. Friend provided CCU with a screenshot of his calls with Doe from the night in question. **(*Id.*)**.

The next day, on April 26, 2017, Officer Pylilo interviewed Plaintiff. **(DEF 619)**. Plaintiff indicated that he never asked Doe if she wanted to have sex or if it was ok to have sex, but he believed the encounter to be consensual. **(*Id.*)**. Plaintiff initially stated that Doe never handed him a condom, but that she had it in her hands, and he understood this to mean she wanted to have sex. **(*Id.*)**. Plaintiff then changed his statement, and claimed that Doe gave him the condom and said, "here take this." Plaintiff additionally indicated that on a scale of one to ten, with respect to whether

he was drunk, he was a four or five. (*Id.*). For his part, Plaintiff drank eight beets during the approximately 90 minutes he was at the Stables. **(DEF 653)**.

On May 1, 2017, Officer Pylilo concluded her investigation by interviewing Big Brother. **(DEF 621)**. During the interview, Big Brother explained that Plaintiff's intercourse with Doe was "looked upon as a passage to manhood." (*Id.*).

On May 12, 2017, Dean Overton began his own investigation in his capacity as Dean of Students. **(DEF 633-657)**. Dean Overton conducted an initial meeting with Plaintiff that afternoon; Plaintiff's attorney and his parents were present at this meeting. Plaintiff presented a signed affidavit to Overton at this meeting in lieu of conducting an interview. **(DEF 692)**. During the course of his initial investigation, Dean Overton interviewed nine CCU students, including Doe, Plaintiff, Big Brother, Roommate #1, and Roommate #2. **(DEF 633-657)**. Dean Overton concluded his investigative report on July 24, 2017, in which he determined there was sufficient evidence to recommend that the Student Conduct Board evaluate the case and charges alleged by Doe to determine possible violations of the Code of Student Conduct by Plaintiff. **(DEF 657)**. Dean Overton's report was available to Plaintiff and his attorney for questions or clarification based on any details within the report. **(Overton Dep. p. 11)**.

The Student Conduct Board thereafter held a hearing. **(DEFS 705)**. The composition of the Student Conduct Board consisted of all men and one woman. **(Fallows Dep. p. 131)**. Plaintiff was permitted to present both fact and character witnesses, cross-examine witnesses, and he was allowed to have both his attorney and a support person present during the hearing. (***Id*; Overton Dep. p. 10; 34**). Ultimately, the Student Conduct Board found, based upon all evidence and testimony, that Plaintiff committed sexual misconduct, in violation of the Code of Student

Conduct. **(DEFS 707-709)**. As a result of this finding, the Student Conduct Board suspended

Plaintiff from CCU for eighteen months. **(DEFS 708-709)**.

## LEGAL STANDARD

The court shall grant summary judgment "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed.

R. Civ. P. 56(a). Summary judgment should be granted when there is no genuine issue of material

fact based on the 'materials in the record, including depositions, documents, electronically stored

information, affidavits or declarations, stipulations (including those made for purposes of the

motion only), admissions, interrogatory answers, or other materials.'" *Hardwick ex rel. Hardwick*

*v. Heyward*, 711 F.3d 426, 433 (4th Cir. 2013) (quoting Fed. R. Civ. P. 56). Although a court must

view the evidence in the light most favorable to the nonmoving party, *id.*, the non-moving party

"must provide more than a scintilla of evidence—and not merely conclusory allegations or

speculation—upon which a jury could properly find in its favor," *Design Res., Inc. v. Leather*

*Indus. of Am.*, 789 F.3d 495, 500 (4th Cir. 2015). *See Anderson v. Liberty Lobby, Inc.,* 477 U.S.

242, 255 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit

under the governing law will properly preclude the entry of summary judgment. Factual disputes

that are irrelevant or unnecessary will not be counted." *Id.* at 248. This requires the nonmoving

party to put forward evidence that would be admissible at trial. *See* Fed. R. Civ. P. 56(c).

The movant bears the initial burden of demonstrating that summary judgment is

appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth

specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317,

322-23 (1986). If a movant asserts that a fact cannot be disputed, it must support that assertion

either by "citing to particular parts of materials in the record, including depositions, documents,

electronically stored information, affidavits or declarations, stipulations (including those made for

purposes of the motion only), admissions, interrogatory answers, or other materials;" or "showing

... that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P.

56(c)(1). "Mere unsupported speculation ... is not enough to defeat a summary judgment motion."

*Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.,* 53 F.3d 55, 62 (4th Cir. 1995).

## ARGUMENT

### 1.    Plaintiff's Title IX claim fails as a matter of law because there is no evidence of intentional gender discrimination.

Title IX provides that no person "shall, on the basis of sex, be excluded from participation

in, be denied the benefits of, or be subjected to discrimination under any education program or

activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Title IX prohibits colleges

and universities from denying students access to educational benefits and opportunities on the

basis of the student's gender. *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 650, (1999);

*Jennings v. Univ. of N. Carolina*, 482 F.3d 686, 699 (4th Cir. 2007). In order for the plaintiff to

prevail against the educational institution under Title IX, he must demonstrate that the educational

institution engaged in "intentional" gender discrimination against him. *Baynard v. Malone*, 268

F.3d 228, 237 (4th Cir. 2001).

Title VII and the judicial interpretations of it "provide a persuasive body of standards" to

which to look "in shaping the contours of a private right of action under Title IX." *Preston v. New

River Cmty. Coll.*, 31 F.3d 203, 207 (4th Cir. 1994). Proof of discriminatory intent is necessary to

state a disparate treatment claim under Title VII. *Int'l Bhd of Teamsters v. U.S.*, 431 U.S. 324, 335

n. 15 (1977). To create the presumption of any illegal discrimination, the plaintiff "must show that

he has been treated differently from similarly situated people outside of the protected class." *Haley*

*v. Va. Commonwealth Univ.*, 948 F.Supp. 573, 580 (E.D. Va. 1996).[3] A plaintiff cannot survive summary judgment by merely proving that the student conduct board's finding resulted from procedurally or otherwise flawed proceedings. *Id.* Rather, to survive summary judgment, the plaintiff must show a causal connection between the allegedly flawed outcome by the student conduct board and gender bias. *Id.*

In the case of universities and discipline proceedings, the United States Supreme Court has emphasized that "courts should refrain from second-guessing the disciplinary decisions made by school administrators." *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 648 (1999) (*citing New Jersey v. T.L.O.*, 469 U.S. 325, 342-343, n. 9 (1985)). Credibility determinations are best left to the discretion of the university disciplinary board. *Doe v. Coll. of Wooster*, 243 F.Supp.3d 875, 894 (N.D. Ohio 2017). "Title IX should be construed to give school administrators the flexibility they require to initiate a reasonable disciplinary process." *Doe v. Univ. of St. Thomas*, 240 F.Supp.3d 984, 990 (D. Minn. 2017). Title IX does not require educational institutions to take heroic measures, perform flawless investigations, or craft perfect solutions. *Doe v. Univ. of Kentucky*, 361 F.Supp.3d 687, 699 (E.D. Ky. 2019).

Here, Plaintiff, by his own admission, has no evidence that any person who played any role in the investigatory or decision-making process harbored any anti-male bias. At the end of the day, all Plaintiff has is his subjective disagreement with the results of the Student Conduct Board hearing, which is not enough to survive summary judgment. **(Fallows Dep. p. 134)**. *See Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013) (More than conclusory allegations and mere

---

[3] For an example of a plaintiff's failure to state a sufficient sex discrimination claim, *see Painter v. Doe*, DOCKET NO. 3:15-cv-00369-MOC-DCK, 2016 WL 4644495, at *6 (W.D.N.C. Sept. 6, 2016) ("Plaintiff...has not alleged any particular case where a female student accused of sexual misconduct was treated differently than he was treated").

speculation is required to defeat summary judgment). From an investigatory perspective, Officer Pylilo, as an officer in CCU's Department of Public Safety, and Dean Overton, as Title IX investigator, played active roles in conducting the investigation into the sexual misconduct allegations against Plaintiff. **(DEF 612-632, DEF 633-657)**. Plaintiff testified he had no evidence that Dean Overton or Officer Pylilo were biased against men. **(Fallows Dep. pp. 149-50)**. The Student Conduct Board decided whether Plaintiff engaged in sexual misconduct, and they decided the penalty to impose on Plaintiff. **(DEF 26)**. Plaintiff testified he did not know the members of the Student Conduct Board, and he further testified that he had no evidence that they were biased against men. **(Fallows Dep. p. 132-33, 150)**.

Plaintiff has no evidence that Dean Overton or Officer Pylilo violated any CCU polices in conducting their respective investigations. **(Fallows Dep. p. 150)**. Likewise, Plaintiff has no evidence that the Student Conduct Board violated any CCU polices during the hearing itself or during their deliberations. **(Fallows Dep. p. 134)**. More generally, Plaintiff has no evidence that anyone at CCU violated any polices as it relates to the sexual misconduct allegations against him. **(Fallows Dep. pp. 150-51)**. Again, all we are left with is Plaintiff's mere disagreement with the result from the hearing before the Student Conduct Board. **(Fallows Dep. p. 134)**. Plaintiff must show more than mere disagreement with the result to present a cognizable Title IX claim.

Plaintiff also fails to point to any comparators to demonstrate that females were treated more favorably than males under similar circumstances. In addition, Plaintiff fails to point to any statistical evidence demonstrating that males were disproportionately found to be in violation of CCU's policies in Title IX investigations and/or hearings.

The investigations conducted by both Dean Overton and Officer Pylilo were fair and balanced. Both Dean Overton and Officer Pylilo interviewed witnesses for Doe and Plaintiff; Dean

Overton even interviewed a private investigator hired by Plaintiff's parents. Further, the adjudication process conducted by the Student Conduct Board was also fair and balanced. The Student Conduct Board examined Dean Overton's report (containing statements of both Doe and Plaintiff's witnesses), Plaintiff's testimony, the testimony of Plaintiff's witnesses (fraternity brothers and a private investigator), character references, and Plaintiff's private investigator's findings. **(Overton Dep. p. 34, 36; Fallows Dep. p. 131-133)**. Plaintiff was permitted to cross-examine witnesses at the Student Conduct Board hearing, present his own fact and character witnesses, and both his attorney and a support person were permitted to be present with Plaintiff during the hearing. **(DEF 705; Overton Dep. p. 10, 34)**. The makeup of the Student Conduct Board during Plaintiff's hearing was predominately male and included only one woman. **(Fallows Dep. p. 131)**.

Plaintiff offers no evidence that gender played a role in Dean Overton and/or Officer Pylilo's investigations, nor does he offer any evidence that the Student Conduct Board harbored any anti-male bias towards him with respect to the hearing or its decision to suspend him from CCU. Without such evidence, this is an easy case. Plaintiff's Title IX allegations of gender discrimination are devoid of any evidentiary or factual support, and for this reason, the Court should grant summary judgment to Defendants.

### 2.    The evidence supports the Student Conduct Board's decision.

While perhaps no further analysis is necessary for this Court to grant summary judgment to CCU as it pertains to Plaintiff's Title IX allegations, it is important for CCU to point out that there is more than sufficient evidence to support the Student Conduct Board's finding that Plaintiff violated CCU's Sexual Misconduct Policy. In this instance, Jane Doe made the sexual misconduct allegations against Plaintiff. **(DEF 633-636)**. CCU played no part in making these allegations—a

fact which Plaintiff begrudgingly acknowledged during his deposition. **(Fallows Dep. p. 136)**. Stated more plainly, CCU did not make the allegations against Plaintiff; another student, Jane Doe, made them. Title IX requires CCU to take action in response to such allegations, which CCU did by way of its investigatory and adjudication process. CCU has no stake in the outcome; it desires only to do its part in responding to allegations of sexual misconduct and to comply with Title IX. Ultimately, CCU (again by Plaintiff's admission) conducted an investigation in accordance with its policies and procedures, and at the close of the investigation, CCU allowed for a hearing in front of the Student Conduct Board. The Student Conduct Board (again by Plaintiff's admission) consisted of unbiased individuals who followed CCU's policies during the hearing itself and during their deliberations.

There are very rarely eyewitnesses to sexual assault allegations. Most often, the only people present were the two people involved in the incident. Frequently, those involved in the incident offer drastically different versions of events. Sexual assault cases (whether criminal or in Title IX) almost always come down to credibility contests, with the trier of fact forced to choose between who it deems more credible—the accuser or the accused. Here, the Student Conduct Board was the trier of fact, and they decided Jane Doe was more credible than Plaintiff. The Student Conduct Board made this decision not because Plaintiff was a male, but because of the evidence in the record.

The Complaint acts as though there is not another side to the story. There is, and that other side paints a compelling and disturbing picture of what occurred between Plaintiff and Jane Doe. Before addressing the evidence, it makes sense to discuss CCU's Sexual Misconduct Policy, which Plaintiff was accused of violating. **(DEF 705)**. Like most colleges and universities, CCU maintains a zero tolerance policy for sexual misconduct. **(DEF 13-29)**. The evidence against Plaintiff, if

believed (which the Student Conduct Board did), demonstrates that Jane Doe was unable to consent to sexual intercourse with Plaintiff at the time the intercourse occurred due to incapacitation, and that Plaintiff knew or should have known of Doe's incapacitation. **(DEF 14)**. According to CCU's Sexual Misconduct Policy, a person cannot consent "if he or she is unable to understand what is happening or is disoriented, helpless, asleep or unconscious for any reason, including alcohol or consumption of other drugs." (*Id.*). The Policy continues, "[a]n individual who engages in sexual activity when the individual knows, or should know, that the other person is physically or mentally incapacitated has violated this policy." (*Id.*). The Policy defines non-consensual intercourse as any sexual penetration (anal or vaginal) with any object by a person upon another person that is without consent and/or by force. **(DEF 17)**. For the avoidance of doubt the Policy makes clear that sexual penetration includes vaginal or anal penetration by a penis or a finger. (*Id.*).

According to Jane Doe, during the sexual encounter, she was intoxicated to the point of incapacitation. **(DEF 633)**. Plaintiff possessed actual knowledge of Jane Doe's incapacitation due to alcohol intoxication. While at the Stables, Plaintiff remarked, "wow, you can drink a lot," after seeing the volume of alcohol Jane Doe consumed. **(DEF 635)**. Once Plaintiff and Jane Doe arrived at her apartment, Jane Doe reports slipping in and out of consciousness, not being able to move, and having a limp body. **(DEF 633)**. Plaintiff corroborates these allegations. Plaintiff acknowledges that when he was attempting to put his penis into her vagina, Jane Doe did not say anything—she was quiet—and more than quiet, she was motionless. **(Fallows Dep. pp. 144-45)**. In Plaintiff's words, she was "still" and "just lying there." **(Fallows Dep. p. 145, 153)**.

While Jane Doe was quiet and still, Plaintiff tried to put his penis into her. **(Fallows Dep. p. 145)**. He lifted her legs, putting both his hands on her hamstrings. (*Id.*). Ultimately, Plaintiff left

bruises and scratches on Jane Doe's legs **(DEF 634)**, and the next day, Jane Doe had red marks and scratches on her face. **(DEF 615-16, 806)**. Plaintiff also forcefully used his fingers to digitally penetrate Jane Doe's vagina and butt. **(DEF 627, 635)**. Plaintiff described it as "finger[ing] the shit out of her." **(DEF 627)**. Ultimately, the combination of Plaintiff's fingers and/or penis left Jane Doe bleeding from her vagina. **(DEF 627, 636)**. Once the sexual encounter was over and Plaintiff saw the blood, he, in his own words, "ran away"—quickly putting on his clothes and leaving Jane Doe's apartment. **(DEF 692; Fallows Dep. pp. 99-100)**. The next day, Plaintiff bragged about his sexual encounter with Jane Doe, texting his Big Brother the following: "I fucked [Jane Doe]," and "I fingered the shit out of her." **(DEF 623, 627, Fallows Dep. p. 86)**.

Jane Doe alleged Plaintiff engaged in non-consensual sexual intercourse with her, when he used his fingers and penis to penetrate her while she was incapacitated. Based on the evidence, the Student Conduct Board certainly could have found that Plaintiff violated CCU's Sexual Misconduct Policy. Plaintiff's allegations of gender discrimination (for which there is no evidence) ignores the evidence against him in support of the Sexual Misconduct allegations. At the end of the day, the fact that there is evidence to support the Student Conduct Board's decision is compelling evidence that Plaintiff was not the victim of gender discrimination. The Student Conduct Board simply found Jane Doe more compelling than Plaintiff.

3. **Plaintiff's claim for violation of OCR Rules is not cognizable as a matter of law.**

Plaintiff alleges that CCU violated OCR Rules.[4] In *Gebser v. Lago Vista Indep. Sch. Dist.*, the Supreme Court of the United States stated it had "never held ... that the implied private right of action under Title IX allows recovery in damages for violation of ... administrative

---

[4] The Complaint does not even identify what OCR Rules CCU allegedly violated.

requirements."[5] 524 U.S. 274, 292 (1998). The Court found that a school's "failure to promulgate a grievance procedure [did] not itself constitute discrimination under Title IX" and only "the Department of Education could enforce [a regulatory] requirement administratively." *Id.* Numerous district courts have interpreted *Gebser* to mean there is no private right of action to enforce grievance procedures and other Title IX regulations. *See, e.g., Univ. of St. Thomas*, 240 F.Supp.3d at 989. Specifically, the Fourth Circuit has stated monetary damages are only available under Title IX in instances of "intentional conduct" that violates the clear terms of the Title IX statute. *Baynard*, 268 F.3d at 237.

Plaintiff alleges CCU violated unidentified OCR Rules, and Plaintiff attempts to assert a cause of action for such violations. **(Complaint, ¶ 52-66)**. Under *Gebser*, there is no private right of action to enforce CCU's alleged violations of OCR Rules. *Univ of St. Thomas*, 240 F.Supp.3d at 989. Only the Department of Education can enforce such violations. *Gebser*, 524 U.S. at 292. Because there is no private right of action to pursue alleged violations of OCR Rules, Plaintiff's second claim fails as a matter of law. Accordingly, CCU is entitled to summary judgment on Plaintiff's cause of action for alleged violation of OCR rules.

### 4.    Plaintiff's breach of contract claim is barred by the Eleventh Amendment.

Plaintiff alleges in his Complaint that CCU breached an agreement with Fallows with respect to the "enforcement" of its Code of Student Conduct within the Student Handbook. **(Complaint, ¶ 69)**. Importantly, however, the Eleventh Amendment bars suits in federal courts for money damages against an "unconsenting State." *Edelman v. Jordan*, 415 U.S. 651, 663

---

[5] Claims for injunctive relief in Title IX cases are denied where the plaintiff is no longer a student at the institution. *Parker v. Franklin Cty. Cmty. Sch. Corp.*, 667 F.3d 910, 915 (7th Cir. 2012); *Grandson v. Univ. of Minn.*, 272 F.3d 568, 574 (8th Cir. 2001). Plaintiff is no longer a student at CCU; thus, he is not entitled to injunctive relief.

(1974). This immunity extends to "arm[s] of the State," *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977), including state agencies and state officers acting in their official capacity. *Gray v. Laws*, 51 F.3d 426, 430 (4th Cir. 1995). "Numerous courts have decided whether public state universities are 'arms of the state.' Almost universally, the answer has been in the affirmative." *Maryland Stadium Auth. v. Ellerbe Becket Inc.*, 407 F.3d 255, 262 (4th Cir. 2005).

Most importantly, this Court already held in *Doe v. Coastal Carolina University* that CCU is an arm of South Carolina. *See Doe v. Coastal Carolina Univ.*, 359 F.Supp.3d 367, 381 (D.S.C. 2019).[6] Indeed, the Doe Court held that CCU was entitled to Eleventh Amendment immunity with respect to pending state law claims against it (**breach of contract**, breach of the covenant of good faith and fair dealing, promissory estoppel, and negligence), and such claims were dismissed. *Id.*

Thus, this Court previously dismissed a state law breach of contract claim against CCU (as alleged here) because of the immunity provided by the Eleventh Amendment. Accordingly, Plaintiff may not, as a matter of law maintain his breach of contract claim against the CCU in federal court, and this claim should be dismissed.[7]

**5.    Plaintiff's Section 1983 claim fails as a matter of law.**

**I.    <u>CCU is not a "person" under Section 1983.</u>**

---

[6] In order to determine whether CCU was an arm of the state entitled to Eleventh Amendment immunity, this Court, in *Doe*, analyzed the Fourth Circuit *Ram Ditta* factors: (1) whether the state treasury will be responsible for paying any judgment that might be awarded; (2) whether the entity exercises a significant degree of autonomy from the state; (3) whether the entity is involved with local versus statewide concerns; and (4) how the entity is treated as a matter of state law. *Doe v. Coastal Carolina Univ.*, 359 F. Supp. 3d 367, 379 (D.S.C. 2019). The Doe Court held "the *Ram Ditta* factors all weigh in favor of finding [CCU] an arm of South Carolina." *Id.*
[7] Substantively, Plaintiff offers no evidence in support of his allegations for breach of contract. For example, he offers no evidence of how CCU allegedly breached a contract with him.

Section 1983 imposes liability upon every "person," who "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia," deprives any other person "of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983.  In 1989, the Supreme Court decided specifically whether the state was a "person" under Section 1983. *Will v. Michigan Dep't of State Police*, 491 U.S. 58 (1989). In deciding this issue, the Court held, "We hold that neither a State nor its officials acting in their official capacities are 'persons' under Section 1983." *Id.*; *see Lapides v. Bd. of Regents of Univ. Sys. of Georgia*, 535 U.S. 613, 617 (2002) ("[A] State is not a "person" against whom a § 1983 claim for money damages might be asserted.").

As discussed more fully above with respect to Plaintiff's breach of contract claim, this Court has already held that CCU is an arm of the state of South Carolina. *Doe*, 359 F.Supp. at 381. Accordingly, it is abundantly clear that CCU is an arm of the state, and as an arm of the state, CCU does not fall within the definition of "person" under Section 1983. Thus, Plaintiff may not, as a matter of law maintain his Section 1983 causes of action against CCU, and this claim should be summarily dismissed.[8]

## II.     Plaintiff's Section 1983 claim against Officer Pylilo and Dean Overton is unsupported by the record.

There is additionally no evidence in the record to support a Section 1983 claim against Officer Pylilo and Dean Overton. Both Pylilo and Overton merely conducted investigations with respect to the sexual assault allegation by Doe against Plaintiff, and there is certainly no evidence

---

[8] Substantively, Plaintiff offers no evidence in support of his 1983 claims against CCU. For example, Plaintiff testified that CCU did not violate any of its policies as it relates to the sexual misconduct allegations against him. (**Fallows Dep. pp. 150-51**). Plaintiff has failed to point to any CCU policy that fails to provide the protections required by the Constitution. Thus, it stands to reason, if CCU did not violate any of its policies, it did not violate Plaintiff's Constitutional rights either.

that his Constitutional rights were violated with respect to either investigation. Although Plaintiff claims Officer Pylilo acted with gender-based bias, despite his admission that he has no evidence to support such an allegation, Plaintiff has not established that Officer Pylilo treated females accused of sexual misconduct differently than males accused of such conduct. Plaintiff received notice of Doe's claim against him four days after the incident when he was questioned by Officer Pylilo, wherein he admitted he was free to leave the entire time. **(Fallows Dep. p. 113)**. Plaintiff's speculation is insufficient to survive summary judgment. *Ennis*, 53 F.3d at 62.

Plaintiff's claim that Dean Overton deprived him of various Constitutional rights is without evidentiary support. Once more, Dean Overton's role with respect to the allegation against Plaintiff was to conduct an investigation and submit his report to the Student Conduct Board. **(Overton Dep. p. 42)**. Dean Overton informed Plaintiff that his attorney could be present for all meetings, and Dean Overton did permit Plaintiff's attorney to be present for all such meetings. **(DEFS 963-964)**. Dean Overton additionally interviewed witnesses suggested by Plaintiff, including a private investigator hired by Plaintiff's parents. Dean Overton's report was available to Plaintiff and his attorney for questions or clarification based on any details within the report. **(Overton Dep. p. 11)**. Plaintiff's claim that he has been deprived of any Constitutional right by Officer Pylilo or Dean Overton is wholly unsupported by the record and is due to be dismissed.

## CONCLUSION

For the foregoing reasons, this Court should grant summary judgment to Defendants on each cause of action asserted by Plaintiff. Such claims are wholly unsupported by the evidence. In addition, Defendants pray for such other and further relief as the Court may deem just and proper under the circumstances.

*[signature page to follow]*

Dated:   October 3, 2022                    **BURR & FORMAN LLP**

By:   */s/ James K. Gilliam*
           James K. Gilliam (Fed ID 10761)
           104 South Main St., Suite 700 (29601)
           Post Office Box 447
           Greenville, SC  29602
           864.271.4940 (Telephone)
           864.271.4015 (Facsimile)
           jgilliam@burr.com
           ATTORNEY FOR DEFENDANTS