**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**FLORENCE DIVISION**

Ralph John ("Trey") Fallows, III,                )        **CASE NO.: 4:19-cv-01182-JD**
                                                                )
                    PLAINTIFF,                          )
                                                                )
vs.                                                           )
                                                                )        **PLAINTIFF'S RESPONSE IN**
Coastal Carolina University, Michelyn     )        **OPPOSITION TO DEFENDANT'S**
Pylilo, individually, and Travis E.             )        **MOTION FOR SUMMARY**
Overton, individually,                              )        **JUDGEMENT AND PLAINTIFF'S**
                                                                )        **MEMORANDUM IN SUPPORT OF ITS**
                    DEFENDANTS.                      )        **OPPOSITION**
_____)

**TO:    THE HONORABLE COURT, and Defendants Coastal Carolina University,**
         **Michelyn Pylilo, Travis E. Overton and their attorney, Jim Gilliam, Esq., and John**
         **F. Connell, Esq.:**

         Plaintiff, Ralph John ("Trey") Fallows, III (hereinafter referred to as "plaintiff"), by and

through his undersigned counsel, Thomas C. Brittain., responds in opposition to defendants'

Coastal Carolina University (hereinafter "CCU"), Michelyn Pylilo, and Travis E. Overton

(hereinafter collectively referred to as "defendants"), motion for summary judgment.

## BACKGROUND

         Plaintiff Fallows was a student at CCU from September 2015 to April of 2017, when CCU

suspended him for sexual misconduct allegations made by Jane Doe.  The allegations of sexual

misconduct stem from a blind date between plaintiff and Jane Doe (April 21, 2017).  According to

reports and numerous witnesses, the evening began at a pre-party where both consumed alcohol,

followed by several hours at Sharky's (local bar) where neither were permitted to drink alcohol.

By all accounts, plaintiff and Jane Doe enjoyed the evening together leaving Sharky's and

returning to CCU where Jane Doe invited plaintiff to her room.  Plaintiff and Jane Doe continued

kissing and fondling in Jane Doe's bedroom until Jane Doe left the bedroom returning with a

condom stating, "you are going to need this."  Plaintiff, a virgin, applied the condom and was intimate with Jane Doe until experiencing a problem with the contraceptive.  Just after being intimate, plaintiff and Doe spoke and then plaintiff left.  Jane Doe admits she never said "no" or "stop" or made any other gesture which could be construed as retreating from her prior consent.

That same night, Jane Doe had a male friend over, and left with that friend going to his room where she stayed the night.  On April 23, 2017, Jane Doe went to the hospital alleging plaintiff raped.  Defendant Pylilo of the CCU Public Safety Department investigated the allegations.  Pylilo began her investigation of plaintiff by lying to him so that he would willingly and without counsel show up to meet her. Once there, Pylilo interrogated the teen without providing him Miranda instructions.  Pylilo's report of the interrogation, misrepresents plaintiff's version of events, and unfairly diminishes his credibility.  Contrarily, Pylilo disregarded the inconsistencies in Jane Doe's version of events.  Pylilo then used her sordid version of events to solicit a warrant and arrest plaintiff for serious sexual misconduct charges.

Dean Overton (Dean at CCU) accepted Pylilo's biased facts using them in support of pursuing plaintiff for violation of the school's sexual misconduct policy.  The school prosecution of plaintiff ended at hearing where Overton presided tainting the hearing by sharing findings of fact with the adjudicator which were bias against plaintiff.  Overton did not permit plaintiff an opportunity to cross-examine his accuser.  Despite expert testimony and scientific evidence showing Jane Doe was not intoxicated, the CCU school conduct board found plaintiff guilty of sexual misconduct for having sex with a person that was too inebriated to consent and sanctioned plaintiff to an eighteen-month suspension.

2

Prior to the hearing, plaintiff, sought permission to record the proceeding. Overton denied this request. Plaintiff sought a copy of CCU's recording of the proceeding to substantiate his basis for appeal, but CCU had ruined the audio.

## LEGAL STANDARD

To prevail on a motion for summary judgment, the movant must demonstrate that there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The party seeking summary judgment has the burden of identifying the portions of the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, [which] show that there is no genuine issue as to any material fact and that the moving part is entitled to a judgement as a matter of law." _Celotex Corp. v. Catrett,_ 477 U.S. 317, 322-23 & n.4 (1986) (citing Rule 56(c)). The Court will interpret all inferences and ambiguities against the movant and in favor of the non-moving party. _U.S. v. Diebold, Inc.,_ 369 U.S. 654, 655 (1962). Where the moving party has met its burden to put forth sufficient evidence to demonstrate there is no genuine dispute of material fact, the non-moving party must come forth with "specific facts showing that there is a genuine issue for trial." _Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,_ 475 U.S. 574, 587 (1986) (citing Rule 56(e)). An issue of material fact is genuine if the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party. _Anderson v. Liberty Lobby, Inc.,_ 477 U.S. 242, 257 (1986).

## ARGUMENT

## I.     Title IX Standard In The Fourth Circuit

Title IX prohibits all discrimination on the basis of sex. 20 U.S.C. § 1681(a). In the Fourth Circuit, "in order for a plaintiff to state a plausible claim to relief under Title IX . . . the plaintiff must allege facts that, if true, would 'raise a plausible inference that the university discriminated

3

against [the student] on the basis of sex.'" *Doe v. Washington & Lee Univ.*, No. 6:19-CV-00023, 2021 WL 1520001 at *12 (W.D. Va. Apr. 17, 2021) ("*Washington & Lee II*") (quoting *Sheppard v. Visitors of Virginia State Univ.*, 993 F.3d 230, 235 (4th Cir. 2021)).  A "Title IX plaintiff must establish a 'causal link between the student's sex and the university's challenged disciplinary proceeding,' to prevail on a Title IX claim, and . . . a showing of 'but-for' causation." *Id. at* *12 (quoting *Sheppard*, 993 F.3d at 236).  Presenting "sufficient evidence from which a reasonable jury could conclude that the [university's] determination of responsibility was predicated on biased assumptions" related to gender differences will defeat a motion for summary judgment. *Id.* at *13.

A university's endorsement of a gender-biased view of sexual assault is sufficient to establish that "a reasonable fact finder could plausibly determine that Plaintiff was wrongly found responsible for sexual misconduct and that this erroneous finding was motivated by gender bias." *Doe v. Washington & Lee Univ.*, No. 6:14-CV-00052, 2015 WL 4647996 at *10 (W.D. Va. Aug. 5, 2015) ("*Washington & Lee I*").  Denial of summary judgment is also required when a "reasonable jury could conclude based on the . . . evidence in the record, that in the [university's disciplinary] decision and evaluation of [the parties'] credibility that the [university] subjected them to materially different standards on account of their gender in its assessment of their competing narratives." *Washington & Lee II*, 2021 WL 1520001 at *16.  The "existence of substantial and particularized 'procedural flaws' . . . 'affecting the proof' . . . demonstrates that there is a genuine dispute of material fact whether [the university] discriminated . . . on the basis of sex" also demands the denial of summary judgment. *Id.* at *15 (quoting *Yusuf v. Vassar College*, 35 F.3d 709, 715 (2d. Cir. 1994)).  Such procedural flaws cast doubt on the accuracy of the Title IX proceeding. *Washington & Lee II*, 2021 WL 1520001 at *15.

## II.    CCU Has Failed To Meet Its Burden Of Proving No Genuine Issue Of Material Fact Exists With Regard To Plaintiff's Title IX Claim

4

Review of CCU's papers and the evidence in the record indicates a complete failure to establish the absence of genuine issues of material fact such that dismissal of Plaintiff's Title IX claims would be warranted. CCU's assertion that there is no evidence of gender discrimination is absurd. CCU Memo. at 8-11. The repeated instances of gender discrimination against Plaintiff are detailed extensively below and, for the sake of judicial economy, will not be repeated here. *See* Sections III.-V., *infra.* (detailing multiple instances where CCU has explicitly endorsed an anti-male gender-biased view of sexual assault, showing that CCU subjected Jane and Plaintiff to materially different standards on account of their respective genders, and noting the procedural flaws that combined with the finding of responsibility against Plaintiff would permit a reasonable juror to infer discrimination and causation based on gender). Contrary to CCU's assertion that the Title IX process reached a correct outcome (CCU at 11-14), there is indeed a genuine issue of material fact regarding the accuracy of CCU's Title IX decision. As noted below, CCU subjected Plaintiff and Jane to wildly different standards when assessing the credibility of their competing narratives (Section IV., *infra.*) and committed clear and identifiable procedural flaws that affected the proof of the Title IX process, thereby casting doubt on the accuracy of the Title IX process (Section V., *infra.*). This is sufficient to defeat the instant Motion. *Washington & Lee II*, 2021 WL 1520001 at *15, *16.

The caselaw cited by CCU in support of the instant Motion is distinguishable from the instant matter. There is no need for CCU to rely on Title VII cases[1] when there are clearly

---

[1] The Title IX case the CCU cites to assert that Title VII cases can guide the Court in determining the contours of Title IX matters is also readily distinguishable. CCU Memo. at 8. In *Preston v. Com. of Va. ex rel. New River Cmty. Coll.*, 31 F.3d 203 (4th Cir. 1994), the plaintiff alleged that the defendant university denied her application for a new employment position in 1989 because she filed discrimination charges with the Department of Education and the Equal Employment Opportunity position in 1984. *Preston*, 31 F.3d at 205. Moreover, the Fourth Circuit was limited in stating the relationship between Title VII and Title XI, noting, "Title VII principles should be applied to Title IX actions, **at least insofar as those actions raise employment discrimination claims**." *Id.* at 206 (emphasis added). Accordingly, *Preston* and any Title VII case relied on by CCU are irrelevant to the Court's determination of the instant Motion.

delineated guidelines for how this Court should evaluate Title IX matters. *See* Section I., *supra*. (detailing the relevant Fourth Circuit standards for determining the viability of Title IX claims).[2] Regardless, the lone Title VII case that CCU relies upon notes that proof of a discriminatory motive can "be inferred from the mere fact of differences in treatment." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977). The stark difference in the way that Plaintiff and Jane were treated, as detailed extensively in Section IV., requires the denial of CCU's Motion. *See Washington & Lee II*, 2021 WL 1520001 at *16 (Denial of summary judgment required when a "reasonable jury could conclude based on the . . . evidence in the record, that in the [university's disciplinary] decision and evaluation of [the parties'] credibility that the [university] subjected them to materially different standards on account of their gender in its assessment of their competing narratives.").

CCU offers a misleading and incomplete citation to the holding of *Baynard v. Malone*, 268 F.3d 228 (4th Cir. 2001), in a strange attempt to define the term "intentional." CCU Memo. at 8. In *Baynard*, the Fourth Circuit was evaluating a claim that a school district was deliberately indifferent to a sixth-grade teacher's molestation of a current student when a former student of the teacher had informed the principal that he was molested by the teacher prior to the molestation of the current student. 268 F.3d at 233 The Court noted that a school district must "have notice that it may be liable for a monetary award [under Title IX], *i.e.*, it must actually be aware of the discrimination and fail to remedy it. In other words, **a school district may be held liable under Title IX only for its own misconduct**; the implied damages remedy is available only when the

---

[2] CCU does rely on a Fourth Circuit case for the assertion that "Title IX prohibits colleges and universities from denying students access to educational benefits and opportunities on the basis of the student's gender." CCU Memo. at 8. It is unclear why CCU relies on *Jennings v. Univ. of N. Carolina*, 482 F.3d 686 (4th Cir. 2007), as the defendant university's motion for summary judgment was denied and the case involved an allegation of sexual harassment by a university official, thus rendering it factually distinguishable from the instant matter. *Jennings*, 482 F.3d at 694-695, 701.

funding recipient engages in intentional conduct that violates the clear terms of the statute." *Id.* at 237 (internal quotations and citations omitted) (emphasis added).  It is clear that the term "intentional" means misconduct carried out by the school.  Indeed, the Court further noted, "Title IX liability may be imposed only upon a showing that school district officials possessed actual knowledge of the discriminatory conduct in question." *Id*. at 238.

*Baynard* is so factually distinguishable from the instant matter that it cannot possibly support a grant of summary judgment.  If anything, it supports denial of the instant Motion, as there is evidence in the record (described in detail below) indicating that CCU engaged in misconduct for which it may be held liable under Title IX.  *See* Sections III.-V., *infra*. (detailing multiple instances where CCU has explicitly endorsed an anti-male gender-biased view of sexual assault, showing that CCU subjected Jane and Plaintiff to materially different standards on account of their respective genders, and noting the procedural flaws that combined with the finding of responsibility against Plaintiff would permit a reasonable juror to infer discrimination and causation based on gender).  Indeed, it is unclear how CCU could reasonably argue that actions taken by its employees that violated Title IX are not "intentional."  CCU incredibly asserts that Plaintiff's supposed inability to identify specific instances of procedural error or anti-male gender bias at his deposition warrants a grant of summary judgment.  CCU Memo. at 9-10.  Nor is Plaintiff, as incorrectly claimed by CCU, merely asserting "his subjective disagreement with the results" of the Title IX process. [3]  CCU Memo. at 9.  These arguments, which are patently ridiculous, ignore the copious amount of evidence indicating CCU's anti-male bias and procedural errors present in CCU's own document production which is detailed extensively below in Sections III, IV., and V. and which serves as the basis for Plaintiff's Title IX claim.

---

[3] CCU for some reason relies on a case involving a dispute over Floyd Mayweather's entrance music at WrestleMania XXIV to support this contention.  CCU Memo. at 9-10 (citing *Dash v. Mayweather*, 731 F.3d 303 (4th Cir. 2013)).

CCU incorrectly asserts that Plaintiff is required to identify a female comparator who CCU treated better than him and offer statistical evidence of gender disparities in CCU's Title IX process in order to avoid summary judgment. CCU Memo. at 8-9, 10.  Such evidence is only required to prove a selective enforcement Title IX claim in Circuits where doctrinal divisions of Title IX claims (*i.e.*, erroneous outcome, selective enforcement, deliberate indifference, and retaliation) still exist.  CCU's faulty assertion conspicuously ignores the undisputed fact that the Fourth Circuit has eschewed any doctrinal test for determining the existence of a Title IX claim and instead only requires that a plaintiff "allege facts that, if true, would 'raise a plausible inference that the university discriminated against [the student] on the basis of sex.'"  *Washington & Lee II*, 2021 WL 1520001 at *12 (quoting *Sheppard*, 993 F.3d at 235).  Indeed, one case that CCU relies on to support its unfounded claim was decided decades prior to the Fourth Circuit's adoption of the non-doctrinal Title IX standard.  CCU Memo. at 8-9 (citing *Haley v. Virginia Com. Univ.*, 948 F. Supp. 573 (E.D. Va. 1996)).[4]  Plaintiff is not required to proffer evidence of a similarly situated female comparator or produce statistical evidence of CCU's biased Title IX processes in order to prevail on the instant Motion.

CCU improperly relies on *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629 (1999),  for the contention that "courts should refrain from second-guessing the disciplinary decisions made by school administrators."  CCU Memo at 9.  As an initial matter, this is an inappropriate attempt by CCU to improperly extend a case involving a school district's liability for student-on-student harassment to the university context.  *See Davis*, 526 U.S. at 633-634; 635-636.  Moreover, the

---

[4] CCU also cites to another case that predates the Fourth Circuit's adoption of the non-doctrinal method to supposedly provide "an example of a plaintiff's failure to state a sufficient sex discrimination claim."  CCU Memo. at 9 n.3 (Citing *Painter v. Doe*, 3:15-cv-00369-MOC-DCK, 2016 WL 4644495 (W.D.N.C. Sept. 6, 2016).  In any event, Plaintiff met the current Fourth Circuit standard by showing that there is a causal connection between the flawed university proceeding and gender bias.  Sections III.-V., *infra*.; *Washington & Lee II*, 2021 WL 1520001 at *12, *13.

quotation relied on by CCU is taken completely out of context. The Supreme Court was not stating that school disciplinary processes are immune from judicial review. Rather, the Supreme Court was stating that K-12 victims of peer harassment do not have a right to "make particular remedial demands" in Title IX matters. *Id.* at 648. The remaining out-of-Circuit cases that CCU relies on in its inappropriate attempt to immunize itself from judicial scrutiny are also unavailing.[5]

CCU's assertion that there is evidence to support the Title IX decision is belied by the evidence in the record. As detailed more fully below, CCU ignored evidence from Plaintiff, Jane, and multiple non-party witnesses indicating that Jane was not intoxicated on the night in question, let alone incapacitated to the point where she could not consent to sexual activity. Sections IV.-V., *infra*. CCU also ignored the blatant inconsistencies in Jane's multiple and varying accounts of the night in question and her sexual encounter with Plaintiff. *See* Section IV., *infra*. (detailing the ever-changing tale of the night in question and her sexual encounter with Plaintiff and highlighting the differing standards to which Plaintiff and Jane were held with regard to their competing narratives of the sexual encounter). Additionally, the particular procedural flaws identified by Plaintiff cast doubt upon the accuracy of the Title IX process. *See* Section V., *infra* (detailing the procedural flaws in the Title IX proceeding). The evidence in the record, therefore, requires the denial of the instant motion. *Washington & Lee II*, 2021 WL 1520001 at *15.

---

[5] In *Doe v. Coll. of Wooster*, 243 F. Supp. 3d 875 (N.D. Ohio 2017), the court was analyzing the issue of university credibility determinations in relation to a breach of contract claim. *Coll. of Wooster*, 243 F. Supp. 3d at 894. Regardless, Plaintiff is not asking this Court to revisit CCU's credibility determinations. Rather, he asserts that CCU subjected him and Jane to materially different standards based on their gender in assessing their competing narratives, thus requiring denial of the instant Motion. Section IV., *infra*. *Washington & Lee II*, 2021 WL 1520001 at *16. Unlike the plaintiff in *Doe v. Univ. of St. Thomas*, 240 F. Supp. 3d 984 (D. Minn. 2017), Plaintiff here has identified specific facts that show that CCU "favor[ed] the accusing female over the accused male because of the accused male's gender." *Univ. of St. Thomas*, 240 F. Supp. 3d at 992 (internal quotations and citations omitted); *see* Sections III.-V., *infra* (clearly identifying CCU's anti-male gender bias and preferential treatment of Jane). In *Doe v. Univ. of Kentucky*, 361 F. Supp. 3d 687 (E.D. Ky. 2019), the court employed a doctrinal analysis to determine whether the plaintiff had a claim for deliberate indifference under Title IX. *Univ. of Kentucky*, 361 F. Supp. 3d at 699. While Plaintiff was certainly not expecting a "perfect" Title IX process, he was expecting CCU to follow its own policies and procedures in an unbiased fashion. Because CCU failed to do so, there is no basis for awarding summary judgment. Sections III.-V., *infra*.; *Washington & Lee II*, 2021 WL 1520001 at *16.

CCU relies heavily on evidence provided by Jane that is contradicted by Plaintiff, unbiased non-party witnesses, and even Jane herself. CCU Memo. at 13. Plaintiff certainly does not corroborate that Jane was incapacitated and slipping in and out of consciousness during the sexual encounter as falsely asserted by CCU. CCU Memo. at 13. At his deposition, Plaintiff stated that Jane was "an active participant throughout" the sexual encounter. See **Plaintiff's Exhibit 1** Pages from Fallows Dep. at 146:2-146:3; *see also* Fallows Dep. at 101:16-101:17 ("she was a participant that whole time"). Even if Jane were quiet and still during certain aspects of the encounter, that in no way indicates a lack of consent. The assertion that Plaintiff noticed Jane was intoxicated and said "wow, you can drink a lot" while they were at the pregame is based solely on what Jane told Pylilo and Overton. DEFS 000616; DEFS 000635. Plaintiff never admitted to making this observation or this statement. Notably, Jane only asserted that Plaintiff said "wow, you can drink a lot" after she decided to press charges. DEFS 000616. In her initial discussions with Pylilo, Jane never asserted that Plaintiff made such a statement. DEFS 000000615. Additionally, multiple non-party witnesses who observed and interacted with Jane prior to the sexual encounter did not think that she was intoxicated, let alone incapacitated. DEFS 000639, DEFS 000643, DEFS 000646, DEFS 000665, DEFS 000667-DEFS 000671, DEFS 000741-DEFS 000742 (See **Plaintiff's Exhibit 4** - pages from Defendant's Document Production).

Similarly, the claims that Plaintiff bruised, scratched, and used force to digitally penetrate Jane also come solely from statements that Jane made to either Pylilo or Overton. DEFS 000615, DEFS 000616, DEFS 000634. Plaintiff explained that he meant that he digitally penetrated for a long time when he used the phrase "fingered the shit out of her." Fallows Dep. at 93:6-93:10. In other words, it was not a reference to a forcible, unwanted penetration. It is unclear why CCU believes that a college student acting awkward after his first-ever sexual encounter somehow

proves that it was an assault. CCU Memo. at 14. Indeed, Plaintiff attributed his response following the encounter to his naiveté and his fear of causing an unintended pregnancy after realizing that the condom had broken. Fallows Dep. at 101:8-101:20. It is similarly unclear why CCU believes that crass talk amongst fraternity brothers indicates sexual misconduct. CCU Memo. at 14. Plaintiff was simply excited to share the news of his first sexual encounter. Any sinister reading of the text messages he sent to this fraternity brother is pure speculation.

CCU has utterly failed to meet its burden of showing that no genuine issues of material fact exist with regard to Plaintiff's Title IX claim. However, even if CCU were able to meet this burden, the record shows that there are indeed genuine issues for trial. In either case, CCU's Motion for Summary Judgment must be denied.

## III.    CCU Has Explicitly Endorsed An Anti-Male Gender-Biased View Of Sexual Assault

In *Washington & Lee I*, the university's Title IX officer gave a presentation where she introduced and endorsed an article that "posits that sexual assault occurs whenever a woman has consensual sex with a man and regrets it because she had internal reservations that she did not outwardly express." 2015 WL 4647996 at *10. This presentation was deemed "particularly significant because of the parallels of the situation it describes and the circumstances under which Plaintiff was found responsible for sexual misconduct." *Id*. Additionally, because the Title IX officer influenced the Title IX proceedings at issue, any bias that she displayed was determined to be material to the outcome of the disciplinary proceeding. *Id*. In the instant matter, CCU published material that establishes that CCU's position during he-said-she-said cases of sexual assault and drinking, the female student will always be believed over the male student. As described below, Pylilo, a CCU-employed investigator, wielded considerable influence in the determination of Plaintiff's Title IX matter and exhibited bias in line with this official CCU position.

11

A poster that was publicly displayed on CCU's campus before, during, and after the investigation and adjudication of the false claims against Plaintiff included the following text:

> Jake was drunk.  Josie was drunk.  Jake and Josie hooked up.  Josie could not consent.  The next day Jake was charged with RAPE.  A woman who is intoxicated cannot give her legal consent to sex, so proceeding under these circumstances is a crime.  It only takes a single day to ruin your life.  Think about it!  Be responsible.

See **Plaintiff's Exhibit 2** – Affidavit of Ralph "Trey" Fallows. Exhibit 2-A to Fallows Affidavit; Fallows Affidavit at ¶ 5.  The poster also includes a CCU logo indicating official endorsement of the message. Exhibit 2-A to Fallows Affidavit. The message contained in the poster could not be clearer – in every instance where a female student and male student are drinking prior to a sexual encounter, CCU considers the male student to be a rapist because a female student who has been drinking cannot consent to sex.  There is a direct parallel between this CCU-endorsed material and the circumstances under which Plaintiff was found responsible for sexual assault.

Plaintiff and Jane had both consumed alcohol prior to the sexual encounter.  Just three days after the sexual encounter giving rise to the Title IX claim against Plaintiff, Pylilo "reassured [Jane] that she [w]as believed." DEFS 000620.  This bias on the part of Pylilo was material to the outcome of Plaintiff's Title IX process "due to the considerable influence" she played in determining the outcome of the Title IX proceeding.  *Washington & Lee I*, 2015 WL 4647996 at *10.  While she did not decide whether Plaintiff was responsible, Pylilo was the first person to interview multiple highly relevant witnesses, including Jane and Plaintiff. DEFS 000612-DEFS 000622.  Thus, she was the first CCU employee involved with the Title IX matter to create a narrative surrounding Jane's claims.  As described in further detail below, Pylilo glossed over massive inconsistencies in Jane's retelling of the incident but highlighted minor and/or inconsequential variations in Plaintiff's explanation of the events.  Pylilo's interviews with Jane and Plaintiff also form a major part of the Title IX report, with large swaths of her interview notes appearing in the Title IX report

verbatim. DEFS 000634-DEFS 000635; DEFS 000653-DEFS 000655.    Based on the foregoing, "a reasonable fact finder could plausibly determine that Plaintiff was wrongly found responsible for sexual misconduct and that this erroneous finding was motivated by gender bias."  *Washington & Lee I*, 2015 WL 4647996 at *10.  Accordingly, CCU's Motion for Summary Judgment must be denied. (See **Plaintiff's Exhibit 4** - pages from Defendant's Document Production).

There are myriad other examples of CCU endorsing an anti-male bias with regard to sexual assault on campus.  A presentation Titled "Got Consent??" from 2014 contained the following anti-male statements/claims (See **Plaintiff's Exhibit 4** - pages from Defendant's Document Production):

- Women and girls are the vast majority of victims of sexual assault (DEFS 000363);
- Nearly 1 in 5 women have been raped in their lifetime (DEFS 000363);
- The vast majority (nearly 98%) of perpetrators of sexual assault are male (DEFS 000363);
- "College students are particularly vulnerable: 1 in 5 women has been sexually assaulted while in college" (DEFS 000363);
- "Repeat victimization is common: over a third of all women who were raped as minors are also raped as adults" (DEFS 000363); and
- A slide titled "Campus Sexual Assault: A Particular Problem" only referred to instances where females are victims and males are perpetrators (DEFS 000365):
  - "As noted, 1 in 5 women has been sexually assaulted while she's in college. The dynamics of college life appear to fuel the problem, as many victims are abused while they're drunk, under the influence of drugs, passed out, or otherwise incapacitated." (DEFS 000365); and
  - "Notably, campus assailants are often serial offenders:  one study found that of the men who admitted to committing rape or attempted rape, some 63% said they committed an average of six rapes each." (DEFS 000365).

An internal note on the PowerPoint presentation indicates that CCU believed the information in the first four bullet points above was of the utmost importance, as it directed the creator of the presentation to "Front load this – make it slide #1."  DEFS 000364.  This slide includes the widely debunked claim that one in five women are sexually assaulted while at college.  *See* Ashe Schow, *No, 1 in 5 women have not been raped on college campuses*, WASHINGTON EXAMINER (Aug.

13, 2014) (https://www.washingtonexaminer.com/no-1-in-5-women-have-not-been-raped-on-college-campuses) (detailing the faulty statistics used to prop up the claim that 20 percent of women who go to college are sexually assaulted). This blatantly false statistic[6] appears in multiple other university presentations/official documents. See **Plaintiff's Exhibit 4** (pages from Defendant's Document Production) DEFS 000150, DEFS 000170.

On multiple occasions prior to the investigation of the Title IX allegations against Plaintiff, CCU utilized a scenario where the assailant was male and the victim was female to explain the concept of sexual assault to students. DEFS 000261-DEFS 000265, DEFS 000395. One of these instances was a CCU-sponsored interactive theatre performance on sexual assault and alcohol that included the following statements/claims (See **Plaintiff's Exhibit 4** - pages from Defendant's Document Production):

- "If they are both drunk, isn't she raping him too? NO: Consent is the responsibility of the person initiating the intercourse. If we look back at the scene, Will was initiating the intercourse." (DEFS 000263);
- "Maybe she just regrets having sex and so she making it all up: This is a myth that gets passed around." (DEFS 000264);
- "There is a myth that false reporting happens a lot: Research shows that false reports occur about 2%-8% of the time — the same as other violent crimes." (DEFS 000264);
- "Why would she go through all that? Nobody wants any of this: So it is a myth." (DEFS 000264); and
- "BELIEVE your friends. In fact, how the first person reacts to their story shapes the way they will deal with it from now on . . . how they will feel as a result." (DEFS 000265).

---

[6] CCU also repeatedly promoted *The Hunting Ground* a "documentary" based partly on this false statistic. DEFS 000103, DEFS 000133; *see also* Robbie Soave, *How The Hunting Ground Spreads Myths About Campus Rape*, REASON (November 20, 2015) (https://reason.com/2015/11/20/how-the-hunting-ground-spreads-lies-abou/) ((detailing the myriad inaccuracies, falsehoods, and anti-male biases in *The Hunting Ground*); Emily Yoffe, *How The Hunting Ground Blurs the Truth*, SLATE (June 1, 2015) (https://slate.com/news-and-politics/2015/06/the-hunting-ground-a-closer-look-at-the-influential-documentary-reveals-the-filmmakers-put-advocacy-ahead-of-accuracy.html) (same).

CCU clearly had a well-established agenda in mind prior to the investigation and adjudication of Jane's Title IX complaint. Indeed, anti-male bias was so ingrained at CCU[7] that Pylilo did not think twice about including the following statement in her incident report before her investigation or the Title IX investigation had been completed – "[Jane] was reassured that she [w]as believed." DEFS 000620. The fact that a university official whose incident report would form a large portion of the Title IX investigation report had already decided that Jane was telling the truth before her own investigation and the Title IX investigation were complete would certainly permit "a reasonable fact finder" to "determine that Plaintiff was wrongly found responsible for sexual misconduct and that this erroneous finding was motivated by gender bias." *Washington & Lee I*, 2015 WL 4647996 at *10. Accordingly, CCU's Motion for Summary Judgment must be denied.

## IV. CCU Subjected Plaintiff And Jane To Materially Different Standards On Account Of Their Gender In Assessing Their Competing Narratives

As detailed extensively below, the evidence in the record clearly indicates that CCU subjected Plaintiff and Jane to materially different standards on account of their gender in assessing their competing narratives regarding the sexual encounter giving rise to Jane's false accusations. Such behavior by CCU requires denial of the instant Motion. *Washington & Lee II*, 2021 WL 1520001 at *16.

On April 23, 2017, the day after the sexual encounter, Jane claimed that she did not remember all the details of her sexual encounter with Plaintiff. DEFS 000615. In fact, during her

---

[7] In the years before and after Plaintiff's Title IX matter, CCU also sponsored or promoted multiple events focused on male-on-female sexual violence/misconduct but never promoted any programs painting women as the perpetrator and men as the victim. *See, e.g.*, DEFS 000092 (listing "Walk a Mile in Her Shoes" as event in Sexual Assault Programming Initiatives 2011-2012); DEFS 000095 (listing SAGE (Students Advocating Gender Equality) addressing violence against women and V-Day "One Billion Rising" flash mob and information fair with focus on awareness /prevention of abuse and sexual violence against women as part of Sexual Assault Programming Initiatives 2013-2014); DEFS 000125 (flyer from 2013 advertising One Billion Rising focusing on sexual assault/violence against women and girls that includes the false claim that 1 in 4 college women will suffer a rape or attempted rape during college); DEFS 000143 (flyer from 2018 advertising Walk a Mile in Her Shoes)

interview with Pylilo, Jane provided a conflicting narrative of her encounter with Plaintiff. DEFS 000615. At first, she told Pylilo "she doesn't recall much but said after her date had sex with her she felt something wet near her privates." DEFS 000615. Directly contradicting the claim that she "doesn't recall much," Jane told Pylilo that "the sex was extremely painful and forceful." DEFS 000615. Later in that same interview, she offered the additional contradictory statement that "the last thing she remembered was sitting in her date's car at Lackey Chapel," indicating that she did not recall **any** aspect of the sexual encounter with Plaintiff. DEFS 000615. She also told Pylilo "that she was under the influence of alcohol and that if she was sober she would not have wanted to have sex." DEFS 000615.

Two days later, on April 25, 2017, Jane Doe went to the Public Safety office and provided an extremely detailed accounting of her sexual encounter with Plaintiff including the following additional facts (see **Plaintiff's Exhibit 4** (pages from Defendant's Document Production)):

- Plaintiff and Jane went to her room and started kissing (DEFS 000617);
- Jane was on top of Plaintiff during the encounter (DEFS 000617);
- Jane walked to the bathroom to get a condom in case the kissing led to sex because she was not on birth control (DEFS 000617);
- Jane remembered specific details of the sexual encounter, including digital and anal penetration, repositioning, and her supposed mental state (DEFS 000617);
- Jane was wearing her dress and bra during the encounter (DEFS 000617); and
- Jane supposedly collapsed on the ground as Plaintiff was getting dressed (DEFS 000617). Pylilo made no effort to reconcile Jane's constantly changing narrative.

Pylilo's interview of Jane's roommate, August Mize, indicates that Jane told a completely different story to Mize the day after her sexual encounter with Plaintiff. On the day after the incident, Jane told Mize that she "didn't remember [her sexual encounter with Plaintiff] because she was intoxicated but is remembering more now." DEFS 000618. In direct contradiction to what she would tell Public Safety the very next day, Jane told Mize that she was so incapacitated that Plaintiff had to drag her on top of him. DEFS 000618. This is wholly inconsistent with Jane's

statement to Public Safety that while she was on top of Plaintiff, she made the conscious decision to get off of him, walk to her bathroom, retrieve a condom in case the consensual kissing led to sex, and walk back to her bedroom to be with Plaintiff again. DEFS 000617 (See **Plaintiff's Exhibit 4** - pages from Defendant's Document Production).

Neither Pylilo nor CCU ever questioned why Jane offered multiple, highly-varying accounts of her sexual encounter with Plaintiff in the immediate aftermath of the event. However, in her incident report, Pylilo noted multiple times where Plaintiff's story allegedly changed during his April 26, 2017 interview. *See* DEFS 000619 (stating that Plaintiff changed his story regarding whether Jane had a condom or gave him a condom); DEFS 000620 (stating that Plaintiff changed his story when he told Pylilo that Jane was moaning and saying "right there" during the sexual encounter). The supposed inconsistencies highlighted by Pylilo's report notably impact exculpatory evidence indicating that Jane did indeed consent to the sexual activity that occurred on April 23, 2017. Whether Jane (1) went to retrieve a condom and then returned to the bedroom with it in her hand or (2) whether she went to retrieve a condom, returned to her bedroom, gave it to Plaintiff, and said "here take this" simply does not matter – either way, Jane was providing a non-verbal signal to Plaintiff that she consented to sexual intercourse.

Pylilo's report also notes that Plaintiff observed Jane take her underwear off prior to their sexual encounter, another non-verbal indication of consent that supports Plaintiff's understanding of the events in question. DEFS 000619. It is unclear exactly what Pylilo is referring to when she says that Plaintiff "changed his story to say that [Jane] was moaning and saying right there." DEFS 000620. No prior notation in Pylilo's report states that Plaintiff said Jane was silent throughout the encounter. Pylilo manufactured this supposed "inconsistency" out of whole cloth. In fact, Pylilo's own report clearly notes the multiple other verbal and non-verbal signals that Jane gave

17

to Plaintiff that indicated that the encounter was consensual.  DEFS 000619 (noting that Jane invited Plaintiff to her apartment, kissed Plaintiff, retrieved a condom, handed him a condom, pulled down her dress to expose her breasts, and took off her underwear prior to digital penetration and intercourse taking place).  Moreover, Plaintiff reporting that Jane was at times verbally exhibiting her pleasure with the sexual encounter and actively directing him during the act while at other times was quiet or still is no inconsistency at all.  Indeed, it is undisputed that Plaintiff had difficulty putting on the condom (Fallows Dep. at 144:7-144:14) and inserting his penis into Jane (Fallows Dep. at 144:15-144:17; DEFS 000620), an extremely awkward sexual scenario that easily explains Jane's supposed change in behavior during intercourse.  In reality, the two instances where Pylilo asserts that Plaintiff "changed his story" are no different from the multiple occasions where Jane "remembered" additional facts, yet Pylilo treated Plaintiff and Jane completely differently.[8]  Plaintiff was viewed as not credible for supposed variations in his story that are either minor or not inconsistencies at all.  Jane was viewed as providing further detail to a narrative that Pylilo and CCU had already accepted as true.  Incredibly, Pylilo's report notes that when Jane was reinterviewed on April 26, 2017, "[Jane] was reassured that she [w]as believed."  DEFS 000620.

In a document titled South Carolina Law Enforcement Division Sexual Assault Examination Protocol that was labeled as Plaintiff's Exhibit O in the Title IX process, Jane offered yet another inconsistent accounting of her sexual encounter with Plaintiff.  In this document, Jane asserts that she needed to be helped into a taxi after the formal.  DEFS 000675.  This claim is not supported by evidence besides Jane's supposed recollection of the event, which repeatedly changed throughout the Title IX process.  Moreover, as further detailed below, every non-party

---

[8] Pylilo's favoring the female over the male was, unfortunately, indicative of a pattern of behavior that she exhibited throughout her time at CCU.  *See* Affidavit of Kenneth W. "Tad" Reed (detailing Pylilo's gender-biased behavior while employed by CCU).

witness who offered testimony – either through an interview with Overton or through a witness statement – *asserted that Jane was not intoxicated at the formal*.  Jane's assertion that she needed to be helped into a taxi was not credible, but CCU again ignored Jane's inconsistent statements. In the Sexual Assault Examination Protocol, Jane also claims that she has no recollection of what occurred between the time she was sitting in Plaintiff's car on the way back to her apartment and when she fell out of her bed and felt something wet between her legs.  DEFS 000675.  This is a completely different rendering of the night in question than any other version that Jane offered to CCU in the Title IX process.   Additionally, under "Method(s) employed by assailant(s)" section of the Sexual Assault Examination Protocol, "Yes" is selected for injuries inflicted, which completely contradicts all of Jane's other statements regarding the sexual encounter.   DEFS 000675.  Additionally, the document itself is inconsistent, as the "If yes, describe" section notes, "Is unsure of physical blows but has an abrasion on the left side of upper lip and lip is swollen." DEFS 000675.  Apparently, as long as there was an injury to Jane, CCU was content to ascribe it to Plaintiff.  This should not be surprising, however, as it is a mere continuation of Pylilo's promise to Jane "that she [w]as believed."   DEFS 000620.   (See **Plaintiff's Exhibit 4** - pages from Defendant's Document Production).

During the Title IX process, Overton was made aware of the repeated inconsistent statements that Jane made regarding the night in question and the sexual encounter.  DEFS 000700; DEFS 000703.  Despite actual knowledge of these inconsistencies, Overton inexplicably ignored them and failed to include any reference to them in the Title IX report even though he explicitly noted that Plaintiff supposedly changed his story.  Incredibly, Jane changed her story once again in a document she submitted following Overton's investigation where she provided her explanation of the sexual encounter and an impact statement and claimed that she was slipping "in

and out of consciousness" but *also* somehow in a trance that was broken when intercourse ended. DEFS 000724-DEFS 000725. (See **Plaintiff's Exhibit 4** - pages from Defendant's Document Production). Put simply, Jane's stories regarding the night in question and her sexual encounter with Plaintiff are patently incredible. CCU ignored the painfully obvious fact that Jane was being untruthful about her own behavior and her sexual encounter with Plaintiff.

Among the most egregious exculpatory evidence that CCU ignored was an independent toxicology report that calls into question the extent of Jane's self-reported level of alcohol consumption prior to the sexual encounter. **Plaintiff's Exhibit 2** - Exhibit 2-B to Fallows Affidavit. The "official" toxicology report was prepared by the South Carolina Law Enforcement Division Forensics Services Laboratory was prepared on June 30, 2017 and sent directly to Pylilo in her role as a member of CCU's Department of Public Safety. Exhibit 2-B to Fallows Affidavit. Notably, this document was never produced by CCU in discovery despite being highly relevant to Plaintiff's claims in this case. The toxicology report notes that the urine sample collected as part of Jane Doe's medical examination the day after her sexual encounter with Plaintiff was "Negative" for the presence of ethanol, the scientific name for alcohol. Exhibit 2-B to Fallows Affidavit. Jane self-reported that she drank five shots of liquor, a mixed drink (presumably containing a sixth shot of liquor), a beer, and part of Plaintiff's beer on the night in question. DEFS 000616; DEFS 000635. Plaintiff testified at his deposition that he observed Jane drinking a lesser quantity of alcohol over a 90-minute period at the pregame prior to the formal. See **Plaintiff's Exhibit 1** Fallows Dep. at 58:7-59:11; 61:4-64:8. There is no evidence in the record indicating that Jane drank anything after the pregame during the three to four hours she spent at the formal. See **Plaintiff's Exhibit 1** Fallows Dep at 63:25-64:6; 65:9-65:11.

20

Utilizing the Widmark Formula to calculate the dissipation of alcohol in Jane's system based on her self-reported consumption of seven standard alcoholic drinks and assuming a body weight of 120 pounds (a reasonable estimate based on the photographs of Jane produced by CCU in discovery), she would have had alcohol in her system until approximately 4:00PM on April 24, 2017.[9]  However, the rape kit that would have included a urine sample was conducted at approximately 3:00PM on April 27, 2017.  DEFS 000612-DEFS 000613.  If Jane had actually drunk the amount of alcohol that she had claimed to consume, there still would have been detectible alcohol in her system at the time she gave the urine sample.  The toxicology report is undisputed evidence that Jane was lying about the amount of alcohol she consumed prior to her sexual encounter with Plaintiff.  CCU flatly ignored this highly relevant, exculpatory evidence and inexplicably failed to produce the report in discovery.  A reasonable juror could find that CCU's failure to consider the toxicology report led to CCU's incorrect determination that Jane was too drunk to consent to sexual activity with Plaintiff.  There is also sufficient evidence in the record, as described in great detail above, that would permit a reasonable juror to conclude that CCU's decision not to consider the toxicology report was based on an anti-male bias.  Accordingly, CCU's Motion for Summary Judgment must be denied.  *Washington & Lee II*, 2021 WL 1520001 at *16.

As noted in the Title IX report, Jane admitted to CCU that she was able to walk by herself to her apartment, open the door to her apartment without assistance, willingly go into her room

---

[9] The Widmark Formula calculates blood-alcohol content as follows: BAC = [Alcohol consumed in grams / (Body weight in grams x R)] X 100.  *How to Calculate Blood Alcohol Content (Widmark Formula)*, available at https://www.wikihow.com/Calculate-Blood-Alcohol-Content-(Widmark-Formula) (last accessed November 2, 2022).  R is a constant that is defined as .55 for females.  *Id*.  A standard alcoholic drink contains 14 grams of alcohol.  *Id*.  There are 454 grams in a pound.  *Id*.  Using the Widmark Formula and Jane's self-reported alcohol consumption, her BAC would have peaked at 0.33 – 0.33 = [98/(54,480 x 0.55)] X 100.  Alcohol dissipates at a rate of .015 g/100mL/hour, which is the same as reducing your BAC level by 0.015 per hour.  *Alcohol Metabolism*, available at https://www.bgsu.edu/recwell/wellness-connection/alcohol-education/alcohol-metabolism.html#:~:text=How%20Fast%20Can%20You%20Sober,one%20standard%20drink%20per%20hour (last accessed November 2, 2022).  As a result, it would have taken 22 hours for all of the alcohol that Jane consumed to leave her system – 0.33/0.015 = 22.

with Plaintiff, willingly kiss Plaintiff, and walk by herself to the bathroom to retrieve a condom in case she and Plaintiff had sex. DEFS 000635. According to Jane (as reflected in the Title IX report), she did not begin to feel the effects of alcohol until she laid down on her back after performing all of the aforementioned acts which indicated consent. DEFS 000635. Jane further admitted that she never physically or verbally resisted any advances by Plaintiff at any time prior to first feeling the effects of alcohol. DEFS 000635-DEFS 000636. Thus, by Jane Doe's own actions and admissions as memorialized in the Title IX report, it was reasonable for Plaintiff to believe that she consented to all of the sexual activity that occurred. Indeed, there is no way that he could have known that Jane Doe was supposedly not consenting to sexual activity.

Plaintiff provided information to Overton that supported his claim that the sexual encounter was consensual. He stated that he did not know how much Jane Doe had to drink on the night in question. DEFS 000652. Plaintiff further noted that Jane invited him up to her room after the social and that he and Jane were making out and heavy petting on her bed before she go up, went to the bathroom, returned with a condom, gave him a condom and said, "[H]ere, you are going to need this." DEFS 000652. The Title IX report also noted that prior to the sexual encounter, Jane pulled down her dress to expose her breasts, took her underwear off, went to her bathroom to retrieve a condom, and that Jane was on top while Plaintiff digitally penetrated her. DEFS 000653. (See **Plaintiff's Exhibit 4** - pages from Defendant's Document Production).

Plaintiff's private investigator, Steve Rambam, also provided evidence to CCU indicating that the sexual encounter was consensual. In particular, Rambam stated that his investigation information supports Plaintiff's contentions that (1) Jane gave Plaintiff a condom; (2) Jane did not consume any alcohol in the 3-4 hours prior to the sexual encounter (and even if she did, it would have been a small amount that Plaintiff was not aware of); (3) Jane did not exhibit any alcohol-

induced behavior on the way back to her apartment; (4) Jane did not stumble or display any outward signs of intoxication prior to sexual activity; (5) Jane did not need assistance leaving her apartment prior to the pregame or entering her apartment after the social; and (6) Jane was dancing and not exhibiting signs of intoxication at the social. DEFS 000655-DEFS 000656; DEFS 001084. (See **Plaintiff's Exhibit 4** - pages from Defendant's Document Production).

Non-party witness Mark Wright told Overton that Jane only drank 1-1.5 beers at the pregame. DEFS 000639. He further explained that, while waiting for the cabs from the pregame to the social, he did not observe any out-of-the-ordinary behavior from Jane, nor did he observe Jane drink any alcohol at the social or witness any behavior by Jane at the social that would have indicated that she had been drinking. DEFS 000639; DEFS 000741; DEFS 000742. Wright did tell Overton that he observed Jane looking happy and dancing on Plaintiff at the social. DEFS 000639. He also said that Jane was not exhibiting any signs of excessive alcohol consumption at the social, specifically stating that he did not notice a change in her demeanor to indicate the consumption of alcohol. DEFS 000639; DEFS 000742. Non-party witness Andrew Arney told Overton that during the cab ride from the pregame to the social Jane was consensually kissing Plaintiff, making out with him, and putting her hands on him. DEFS 000640. Non-party witness Dylan Hadaway told Overton that Jane Doe and Plaintiff were kissing for most of the 15-20 minute ride from the pre-party to the formal. DEFS 000642. Arney also stated that he observed Jane and Plaintiff dancing in a risqué way with their hands on each other at the social. DEFS 000641. (See **Plaintiff's Exhibit 4** - pages from Defendant's Document Production).

Non-party witness August Mize, one of Jane's roommates, said that she believed Jane was drunk when she got home because she was loud upon entering the apartment with Plaintiff. DEFS 000649. This is contradicted by Mize and Jane's other roommate (and also a non-party witness in

the Title IX process) Journie Barbour, who did not report that Jane was loud upon returning home from the social despite being in the same room as Mize when Jane returned.  DEFS 000643.  Mize also did not directly observe Jane upon her and Plaintiff's arrival after the social.  DEFS 000649. Barbour did not say that Jane was overly loud, slurring her words, or otherwise displaying verbal signs of drunkenness when she returned home.  DEFS 000643.  Barbour also did not visually observe Jane Doe that evening after she returned home from the social.  DEFS 000643.  As a result of the foregoing, neither Mize's nor Barbour's testimony supports a finding that Jane was incapacitated or otherwise unable to consent when she engaged in sexual contact with Plaintiff. (See **Plaintiff's Exhibit 4** - pages from Defendant's Document Production).

Barbour noted that the day after the encounter, Jane told her she could not remember anything specific about the encounter and kept saying things like "this is all my fault" and "I don't want to get anyone in trouble."  DEFS 000644.  According to Barbour, on the day after her sexual encounter with Plaintiff, Jane said that she did not remember anything after coming back to her apartment "until she woke up and felt something running down her leg."  DEFS 000644.  Barbour's testimony directly contradicts multiple versions of the encounter that Jane had previously offered.

Baily Clay, Jane's RA and another non-party witness, told Overton that he saw Jane at the pregame but did not indicate that she was showing any signs of intoxication at that time.  DEFS 000646.  Clay also spoke with Jane at the social and said that she "seemed fine" during their conversation.  DEFS 000646.  Again, he did not say that she was showing any signs of intoxication. DEFS 000646.  This testimony by Clay, which was provided to CCU during the Title IX process, directly refutes Jane's assertion that she was drunk to the point of incapacitation prior to her sexual encounter with Plaintiff.  In fact, the only time that Clay supposedly observed Jane to be

intoxicated was **_after_** her sexual encounter with Plaintiff. DEFS 000646-DEFS 000647. (See **Plaintiff's Exhibit 4** - pages from Defendant's Document Production).

Additional information provided by Clay during the Title IX process further calls Jane's narrative into dispute. Following Jane's sexual encounter with Plaintiff, Clay brought Jane back to his apartment and slept in the same bed as her. DEFS 000647. He brought Jane back to her apartment at 9:30AM the next morning, and they both fell back asleep. DEFS 000647. When Jane woke up, she took a shower then fell back asleep again while Clay stayed at her apartment. DEFS 000647. After Jane woke up from her post-shower nap, she told Clay he could leave, which he did. DEFS 000647. At 1:15PM that afternoon, Clay returned to Jane's apartment and, for the first time, noticed that Jane had a bruise/scrape on her face and lip as well as bruises on her thighs. DEFS 000647. To be clear, even though Clay had slept in the same bed as Jane at two different locations and spent multiple hours with her that morning in the full light of day, including observing her after she had showered which would have removed any makeup she may have been wearing that could have concealed an injury, he never noticed any bruises on her face or her thighs. The only reasonable inference that could be drawn from Clay's testimony is that Jane suffered the injuries to her face and legs sometime between the time he left on the morning of April 24, 2017, and 1:15PM on April 24, 2017. In other words, the injuries which Pylilo and CCU imputed to Plaintiff could not have been caused by Plaintiff. This revelation calls into question Jane's entire narrative and severely damages her credibility. CCU, however, in a continuation of an unfortunate pattern of anti-male behavior, ignored Clay's testimony and continued to improperly credit Jane's claims against Plaintiff.

Multiple witness statements provided to CCU by non-parties further support Plaintiff's position in the Title IX matter. Branden Brown stated, "The van ride home went without any

issues, no one on the van showed signs of being overly intoxicated . . . Complainant did not give indications that she was overly intoxicated during the ride home." DEFS 000665. He also never observed Jane "stumbling, slurring, nodding, [or] falling," that she did not display any loss of balance, and that she was not confused or disoriented at any time that he observed her on the night in question. According to Brown, Jane "[j]ust seemed normal." DEFS 000667-DEFS 000668. (See **Plaintiff's Exhibit 4** - pages from Defendant's Document Production).

Russell Jacobites, a bouncer at the bar during the social stated that no underage people drank at the social, no women were intoxicated to the point where they could not function, and the only woman he observed to be belligerently drunk had a different hair color than Jane. DEFS 000669-DEFS 000670. Thomas McNamara, another bouncer during the social, noted that all IDs were checked at the door, people under the age of 21 had an "X" put on their hands to prevent them from being served alcohol, and if anyone with an "X" on his or her hand was seen holding a drink, then the drink would be taken away. DEFS 000671. McNamara stated that he did not observe anyone so intoxicated that they could not perform basic motor skills. DEFS 000671. (See **Plaintiff's Exhibit 4** - pages from Defendant's Document Production).

The Title IX report's findings highlight supposed inconsistencies in Plaintiff's story while ignoring the aforementioned exculpatory information from third-party witnesses, inconsistencies in Jane's statements, and inconsistencies/irrational claims in Jane's witnesses' statements. DEFS 000656-DEFS 000657. (See **Plaintiff's Exhibit 4** - pages from Defendant's Document Production). Indeed, despite the overwhelming amount of conflicting narratives offered by Jane, some of which were further contradicted by witnesses that were supposed to support her side, CCU still inexplicably found Jane to be more credible than Plaintiff and improperly determined that Plaintiff committed a Title IX violation. The baseless finding, CCU's failure to follow its own

procedures, and the anti-male bias that permeated CCU at the time that the finding was made, are more than sufficient to create a genuine issue of material fact that requires the denial of CCU's Motion for Summary Judgment.

**V.    CCU's Title IX Process Was Rife With Procedural Flaws Affecting The Proof Of And Thus Casting Doubt On The Accuracy Of The Title IX Proceeding**

Review of CCU's Sexual Misconduct Policy against the evidence in the record shows that there were "substantial and particularized procedural flaws . . . affecting the proof" of Plaintiff's Title IX proceeding, thus casting doubt on the accuracy of the Title IX proceeding and creating a genuine issue of material fact that precludes summary judgment in this matter. *Washington & Lee II*, 2021 WL 1520001 at *15 (internal quotations omitted). Considering the flaws outlined below alongside the improper finding of responsibility by CCU, an "inference of discrimination [on the basis of sex] and causation is reasonably drawn." *Washington & Lee II*, 2021 WL 1520001 at *15.

According to CCU's Sexual Misconduct Policy, "For consent to be valid, there must be a clear expression in words or actions that the other individual consented to that specific sexual conduct." DEFS 000014 at Section I.C. Plaintiff has consistently maintained that Jane Doe offered a clear expression of her consent to the sexual activity in question by both her words and her actions. DEFS 000619, DEFS 000620.

In further explaining consent, the Sexual Misconduct Policy notes

The existence of consent is based on the totality of the circumstances, including the context in which the alleged incident occurred. Silence or the absence of resistance alone is not consent. A person can withdraw consent at any time during sexual activity by expressing in words or actions that he or she no longer wants the act to continue, and, if that happens, the other person must stop immediately."

DEFS 000014 at Section I.C.3. In the instant matter, the totality of the circumstances includes multiple highly relevant factors that were simply ignored by CCU (See **Plaintiff's Exhibit 4** - pages from Defendant's Document Production).:

- Plaintiff's virginity (DEFS 000639);
- Multiple non-party witnesses who directly observed Jane prior to her sexual encounter with Plaintiff and who did not see her drink any significant amount of alcohol (DEFS 000639, DEFS 000669-DEFS 000670, DEFS 000741 DEFS 000742);
- Multiple non-party witnesses who directly observed Jane prior to her sexual encounter with Plaintiff who provided statements indicating that Jane was not showing any outward signs of alcohol intoxication (let alone incapacitation) (DEFS 000639, DEFS 000643, DEFS 000646, DEFS 000665, DEFS 000667-DEFS 000671, DEFS 000741-DEFS 000742);
- Jane's ability to walk unassisted immediately before engaging in sexual contact with Plaintiff as confirmed by her own statements during the Title IX process and undisputed video evidence (DEFS 000635, DEFS 000662, DEFS 000700, DEFS 001084)[10];
- Jane's invitation to Plaintiff to enter her apartment, her bedroom, and her bed (DEFS 000617, DEFS 000652);
- Jane's positioning on top of Plaintiff at the outset of the sexual encounter (DEFS 000617, DEFS 000652);
- Jane's decision to get out of her bed to get a condom (DEFS 000617, DEFS 000652);
- Jane's decision to return to the bed where she had been engaging in sexual activity with Plaintiff after retrieving the condom (DEFS 000617, DEFS 000652);
- Jane's decision to give the condom to Plaintiff (DEFS 000652);
- Jane's statement to Plaintiff that he was "going to need" the condom (DEFS 000652);
- Jane stating that she did not feel any effects of alcohol until she laid down on the bed to engage in sexual intercourse with Plaintiff after Plaintiff had already digitally penetrated her and she had brought a condom to him (DEFS 000635); and
- Jane's admission that she never said anything to Plaintiff to tell him to stop prior to or during intercourse (DEFS 000635-DEFS 000636).

Because CCU ignored these highly relevant and exculpatory facts in reaching its determination that Jane was unable to consent to sexual activity, a reasonable juror could find that such a substantial and particularized harm affected the proof of the Title IX proceeding, thus precluding summary judgment. *Washington & Lee II*, 2021 WL 1520001 at *15.

     The Sexual Misconduct Policy defines "Incapacitation" as follows:

---

[10] The video, which was obtained and prepared by CCU, also contains gender-biased text commentary by Pylilo ("victim enters apt") at 12:07:29. DEFS 001084.

N.B.: A specialized video player is required to view DEFS 001084. A download of the required video player (DEFS 001060) is included as part of **Plaintiff's Exhibit 3.**

> Incapacitation – a state in which someone cannot make rational, reasonable decisions because they lack the capacity to give knowing consent (e.g., to understand the "who, what, when, where, why or how" of their sexual interaction). This expression also covers a person whose incapacity results from mental disability, involuntary physical, emotional, or psychological restraint, and/or from the taking of incapacitating substances.

DEFS 000015 at Section I.L. In the instant matter, Jane provided evidence that indicated that she knew the who, what, when, where, why, and how of her sexual encounter with Plaintiff. DEFS 000617. Thus, it is clear that CCU misapplied its own policy.

CCU's Sexual Misconduct Policy further states, "An individual who engages in sexual activity when the individual knows, or should know, that the other person is physically or mentally incapacitated has violated this policy." DEFS 000014 at Section I.C.1. Evidence provided by Plaintiff, Jane, and multiple non-party witnesses indicates that there were no outward indications that Jane was incapacitated. DEFS 000619, DEFS 000620, DEFS 000635-DEFS000636, DEFS 000639, DEFS 000643, DEFS 000646, DEFS 000652, DEFS 000653, DEFS 000665, DEFS 000667-DEFS 000671, DEFS 000741-DEFS 000742. (See **Plaintiff's Exhibit 4** - pages from Defendant's Document Production). Thus, it would have been impossible for Plaintiff to know, either actually or constructively, that Jane was incapacitated during their sexual encounter. There was, therefore, no basis for CCU's finding of responsibility. When considered in tandem with the outcome of the Title IX process, namely, a finding of responsibility against Plaintiff, the procedural violations detailed above are sufficient to overcome the instant Motion. *See Washington & Lee II*, 2021 WL 1520001 at *15 (holding that "the inference of discrimination and causation is reasonably drawn" when a plaintiff was found responsible for violating Title IX and there were substantial and particularized procedural flaws in the Title IX process).

**VII.**   **Plaintiff withdraws his claim for breach of contract and 42 U.S.C. § 1983 against Coastal Carolina University.**

**VIII.**   **Plaintiff's 42 U.S.C. § 1983 claims against Pylilo and Overton**

Section 1983 imposes liability upon every "person," who under color of any statute, ordinance, regulation, custom or usage of any State or Territory or the District of Columbia deprives any other person of any rights, privileges, or immunities secured by the Constitution and laws. 42 U.S.C. Section 1983.   In *Saucier v. Katz*, the Supreme Court established a two-part test for analyzing civil rights claims (1983 claims): (1) inquiry as to whether a constitutional right has been violated; (2) if so, whether the right was clearly established.  *Saucier v. Katz*, 533 U.S. 194, 200 (2001).   Plaintiff's 42 U.S.C 1983 claims are for violations of his fifth amendment and fourteenth amendment rights.

**VII.**   **Fifth Amendment**

 "To safeguard an uncounseled individual's fifth amendment privilege against self-incrimination, suspects subject to custodial interrogation by law enforcement officers must be warned that they have the right to remain silent, that anything they say may be used against them in court, and that they are entitled to the presence of an attorney."  (In the Interest of R.H., 791 A.2d 331 (2002) (Supreme Court of Pennsylvania, finding student entitled to Miranda during custodial interview with school police officer) citing *Thompson v. Keohane*, 516 U.S. 99, 107, 116 S.Ct. 457, 133 L.E.2d 383 (1995) (citing *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 12 L.Ed.2d (1966).

Supporting his claim for violation of the 5th amendment, is Pylilo's interrogation of plaintiff.  Pylilo brought Plaintiff in to discuss the rape allegations under the guise of discussing Jane Doe's missing phone.  After this lie, Pylilo then interrogated Plaintiff without reading him

Miranda rights.  Plaintiff's statements to Pylilo were used against him to both obtain a warrant for his arrest and to find against him at the disciplinary hearing.  The right to counsel is a clearly established right in the context of criminal investigation.  Pylilo, a public safety officer, with over twenty years of experience in law enforcement, knew Plaintiff had a constitutional right to counsel (or the presence of a lawyer) during the interrogation.

## VIII.    14th Amendment

Pylilo's misconduct includes violation of due process rights as Pylilo ignored exculpatory evidence and tainted the process.  In her investigation, Pylilo omitted that Plaintiff was a virgin, witness statements that Jane was sober, inconsistencies in Jane's story, and the fact that Jane had consented and never retracted consent.  DEFS 000615, 000617, 000618, 000619.  Leaving these facts out, Pylilo presented an lopsided version of the facts securing a charges and an arrest of plaintiff for sexual misconduct.  (At that moment, plaintiff's defense of the school matter became extraordinarily difficult – having to guard against criminal conviction.)  Pylilo earned a reputation for omitting important evidence, which if included, would have prevented charges.  According to her supervisor, Officer Reed, in five of seven cases where Pylilo secured criminal charges against students for sexual misconduct the State ultimately dismissed the charges.  (See Affidavit of Kenneth Warren Reed).  In each of these cases, Pylilo had ignored exculpatory evidence.  *Id*.  The problem was so persistent that CCU's Public Safety Department conducted an internal review of these cases, made a report of their review, and counseled Pylio on her responsibility to consider exculpatory evidence; not just evidence in favor of the accused.

"In the context of school disciplinary proceedings, the Due Process Clause requires a fair procedure.  What is fair depends on the circumstances of each case.  Thus, due process 'is a flexible standard which varies depending upon the nature of the interest affected and the circumstances of

deprivation.'" *John Doe v. The Ohio State University, et al.* 311 F. Supp.3d 881 (S.D. Ohio 218). "When a case is a disciplinary expulsion, rather than an academic one, we conduct a more searching inquiry." *Id* at 891, citing *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 633 (6th Cir. 2005).

Pylilo ignored exculpatory evidence failing to report that Plaintiff was a virgin, that Jane Doe had consented, brought a condom to plaintiff just prior to intimacy, and excluded a multitude of inconsistencies in Jane Doe's version of events.  DEFS 000615, 000617, 000618, 000619.

Overton and CCU forget that "sexual assault is a deplorable act of violence [and]  accusing someone of such an act is no small matter. If a college student is to be marked for life as a sexual predator, it is reasonable to require that he provided a fair opportunity to defend himself…" *Doe v. Brandeis Univ.*, 177 F.Supp.3d 561, 573 (D. Mass. 2016).  Universities have perhaps, in their zeal to end the scourge of campus sexual assaults, turned a blind eye to the rights of accused students.  Put another way, the snake might be eating its own tail.  *Id*. at 892 citing Joe Dryden et al., *Title IX Violations Arising from Title IX Investigations: The Snake Is Eating Its Own Tail*, 53 Idaho L. Rev. 639 (2017).

Dean Overton perpetuated the denial of Plaintiff's due process rights.  Overton was responsible for providing Plaintiff with a non-bias investigation and fair hearing.  Overton failed to obtain exculpatory evidence and furnished a report to the adjudicator which wholly disregarded Jane Doe's inconsistencies.  Under the circumstances of this case – a he-said she-said type of case, those failures were impactful.  If those failures could be remedied at a hearing, they could only be remedied by cross-examination. In the context of student disciplinary hearings, "cross-examination is essential to due process…[particularly] in a case that turns on a choice between believing an accuser and an accused." *Id*. at 892 (Op. & Order at 18, Doc. 82 (quoting *Flaim*, 418 F.3d at 641 (dicta)).  Had Plaintiff been able to cross-examine his accuser, he could have asked

32

her, for example, to explain why she first reported she had no memory of the event and then later reported details; why she claims she was unable to talk during the intimacy, but reported both speaking with Plaintiff and others around the same time; how Plaintiff was supposed to know she was intoxicated given that he had not seen her drink for more than three hours, that she was able to walk without assistance to the bathroom to get a condom, and that the alcohol hit her when she laid down; why multiple witnesses said she was sober. Cross-examination, along these lines, would have diminished Jane Doe's credibility and salvaged Plaintiff.[11] Without the benefit of cross-examination, the adjudicator was apt to rely upon Overton's skewed findings of facts and wrongfully conclude plaintiff a rapist.[12]

The entire process was bias against Plaintiff.  Plaintiff was: (1) tricked into an interrogation; (2) with a lopsided version of facts provided to the adjudicator; (3) no meaningful time to challenge those findings; (4) no cross-examination; (5) false pending criminal charges requiring measured defense; (6) and Overton and panel ignoring toxicologist and scientific report contradicting Jane Doe's assertion that she was incapacitated during intimacy.

Plaintiff's deprivation of due process persisted after the sham hearing.  By the time of the hearing, plaintiff knew the school was bent on denying him fair treatment.  Plaintiff figured, he had a chance to avoid the stigma of being a rapist, through the school's appeal process, where a transcript would plainly reveal bias.  Plaintiff requested an opportunity to record the hearing, which Overton denied him. At that moment, plaintiff knew the "writing was on the wall."  Overton recorded the hearing and taped over it rendering it useless, depriving plaintiff of an appeal and of

---

[11] In the famous words of John Henry Wigmore, cross-examination is "beyond any doubt the greatest legal engine ever invented for the discovery of truth."  *Doe v. Brandeis Univ.*, 177 F.Supp.3d 561, 605 (D. Mass. 2016).  3 Wigmore, Evidence § 1367, p. 27 (2d ed. 1923).

[12] The ability to cross-examine is most critical when the issue is the credibility of the accuser.  *See Donohue v. Baker, 976 F.Supp. 136, 147 (N.D.N.Y. 1997).*

critical evidence in this case.  While there is no clearly established process which much be used to afford a student with due process, a student's right to a fair and impartial process is clearly established and is dictated by the facts and circumstances of each case. "If a college student is to be marked for life as a sexual predator, it is reasonable to require that he be provided a fair opportunity to defend himself…*Doe v. Brandeis Univ.*, 177 F.Supp.3d 561, 573 (D. Mass 2016).

## CONCLUSION

Plaintiff hereby requests an order of from the Court denying Defendant's request for summary judgment as to Plaintiff's Title IX claim, and its claims against Defendant Pylilo and Defendant Overton in their individual capacities under 42 U.S.C. § 1983.

**RESPECTFULLY SUBMITTED:**

**THE BRITTAIN LAW FIRM, P.A.**

 *s/A. Preston Brittain*
Thomas C. Brittain, Esquire (Fed ID #04920)
A. Preston Brittain, Esquire (Fed ID # 10408)
4614 Oleander Drive
Myrtle Beach, SC 29577
843-449-8562
843-497-6124 (fax)
tommyb@brittainlawfirm.com

November 9, 2022                **WARSHAW BURSTEIN, LLP**

By:  /s/ Kimberly C. Lau
Kimberly C. Lau (*pro hac vice* admission pending)
James E. Figliozzi (*pro hac vice* admission pending)
575 Lexington Avenue
New York, New York 10022
(212) 984-7709
 klau@wbny.com
jfigliozzi@wbny.com

*Attorneys for Plaintiff*