IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| Ralph John ("Trey") Fallows, III, | ) | **CASE NO. 4:19-cv-01182-JD** |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Coastal Carolina University, Michelyn | ) | **PLAINTIFF'S SUPPLEMENTAL** |
| Pylilo, individually, and Travis E. | ) | **MEMORANDUM OF LAW IN** |
| Overton, individually, | ) | **SUPPORT** |
| | ) | |
| Defendants. | ) | |
| | ) | |

**TO:   THE HONORABLE COURT and ABOVE-NAMED DEFENDANTS:**

Plaintiff brought 42 U.S.C. § 1983 causes of actions against Travis E. Overton and Michelyn Pylilo in their individual capacities on April 23, 2019. Overton and Pylilo answered asserting qualified immunity as a defense to those 1983 claims. Time passed. Three years and seven months later, defendants filed a motion for summary judgment, but Overton and Pylilo failed to argue that they were entitled to qualified immunity in their original brief. However, the individual defendants asserted that they were entitled to qualified immunity for the first time in their reply brief. This argument is without a doubt untimely. The Court granted CCU's motion for summary judgment dismissing Plaintiff's Title IX claims and addressed the ill-raised qualified immunity position by requiring Plaintiff to respond to the improper argument raised by the individual defendants within 15 days.

**AGRUMENT**

The Court should deny the individual defendants' tardy summary judgment motion. In fairness to the Court, Plaintiff understands that courts desire an early determination of qualified immunity. The reason, in general, for the court's desire for early determination of qualified

immunity equates with the intended function of the qualified immunity defense – prevention of costs of litigation/judgment for good faith mistakes in the performance of the officer's duties. Here, much like the qualified immunity defense in general, the intended purpose is unfilled.  Pylilo and Overton are being provided counsel through the school and have illustrated no desire to press the issue of qualified immunity until belatedly and improperly asserting the defense for the first time in the reply brief of their motion for summary judgment.  The Court should deny this motion and not afford the individual defendants a gracious consideration of their tardy motion.[1]  Even if the Court decides to entertain the individual defendants' belated and improper motion, Pylilo and Overton are state officials who ignored Plaintiff's clearly established *Miranda* and *Brady* rights. As a result, their motion should be denied on the merits.

**Qualified Immunity**

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

In determining whether an official is entitled to qualified immunity, the Fourth Circuit typically follows a two-step approach of: (1) identifying the constitutional or statutory violation and (2) whether the law is clearly established. *Pearson vs. Callahan*, 555 U.S. at 232, 129 S.Ct. 808The Fourth Circuit has also recognized inquiry into whether the conduct complained of is a discretionary function of the officer's job.

As stated above, the purpose of qualified immunity is to shield government actors from liability (costs of litigation/judgment) for mistakes related to discretionary functions of their job.

---

[1] Both CCU and the individual defendants missed the scheduling deadline to file summary judgment.

Courts are becoming more reluctant to strictly apply the defense of qualified immunity because, like here, the reality is that the individual officers are not paying for the costs of litigation. Section 1983 "admits of no immunities" and qualified immunity often serves no purpose as officers seldomly pay for the cost of litigation or judgement rendered against them. *Malley v. Briggs*, 475 U.S. 335, 339 (1986). The false practical application of the immunity is not the only reason for scrutiny of the doctrine, as qualified immunity is also being scrutinized because of the complexity of determining what is "clearly established" law and the nationwide inconsistencies created by the second step of the *Harlow* framework.

The Fourth Circuit has also questioned the second step of the *Harlow* framework having stated that a defendant "is not entitled to invoke qualified immunity simply because no other court decisions directly have addressed circumstances like those presented" in the case before it. *Sims v. Labowitz*, 885 F.3d 254, 264 (4ᵗʰ Cir. 2018) (citing *Clem v. Corbeau*, 284 F.3d 543, (4ᵗʰ Cir. 2002)). The Fourth Circuit views qualified immunity as shielding officers from liability from "bad guesses in gray areas." *Braun v. Maynard*, 652 F.3d 557, 560 (4th Cir. 2011) (quoting *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992)).

A. *Pylilo*

Plaintiff's complaint alleges Pylilo violated his basic constitutional rights under the Fifth Amendment and the Fourteenth Amendment of the United States Constitution. Additionally, Plaintiff's complaint, as relates to Pylilo, clearly sets forth pre-trial constitutional deprivations and, therefore, implicates the Fourth Amendment of the United States Constitution. Further, Plaintiff sets forth that Pylilo violated his constitutional rights in failing to advise him of his *Miranda* rights during a custodial investigation, improperly seizing him for interrogation, falsely arresting him, further, that Pylilo withheld material exculpatory information from the State to a obtain warrant

for his arrest and to mis-direct the school's disciplinary action to ensure a finding against him.[2]  As detailed below, Pylilo's behavior violated Plaintiff's constitutional rights against self-incrimination (Fifth Amendment), right to counsel (Fifth Amendment), right to personal liberty (Fourth Amendment), and right to a fair process (Fourth and Fourteenth Amendments).

*Facts and Circumstances surrounding the violation of Plaintiff's rights*

Pylilo's investigation began with a lie.  Pylilo sought out Plaintiff under the pretext of seeking information related to a missing phone.  Plaintiff, having no idea of any accusation against him (and being innocent of any crime), showed up to assist Public Safety with the phone search. Pylilo proceeded to interrogate Plaintiff without reading him his *Miranda* rights or advising him that he could have counsel before speaking with her about the accusations.

From there, Pylilo's investigation is a lopsided anti-male warlock-hunt.  Pylilo ignored the inconsistencies of Jane Doe's ever-changing version of events and harped upon the minor clarifications that Plaintiff provided regarding his recollection of the events in question.  For example, on April 23, 2017, the day after the sexual encounter, Jane claimed that she did not remember all the details of her sexual encounter with Plaintiff.  DEFS 000615.  In fact, during her interview with Pylilo, Jane provided a conflicting narrative of her encounter with Plaintiff.  DEFS 000615.  At first, she told Pylilo "she doesn't recall much but said after her date had sex with her she felt something wet near her privates."  DEFS 000615.  Directly contradicting the claim that she "doesn't recall much," Jane told Pylilo that "the sex was extremely painful and forceful." DEFS 000615.   Later in that same interview, she offered the additional contradictory statement that "the last thing she remembered was sitting in her date's car at Lackey Chapel," indicating that

---

[2] Exculpatory evidence withheld includes: (1) Pylilo's bias against males accused of rape; (2) Plaintiff's consistent statement that Jane Doe handed him a condom just before they attempted to have sex; (3) Jane Doe's inconsistent statements related to the evening and her ability/inability to remember what occurred.

she did not recall **any** aspect of the sexual encounter with Plaintiff.  DEFS 000615.  She also told Pylilo "that she was under the influence of alcohol and that if she was sober she would not have wanted to have sex."  DEFS 000615.

Two days later, on April 25, 2017, Jane Doe went to the Public Safety office and provided an extremely detailed accounting of her sexual encounter with Plaintiff including the following additional facts (*see* Plaintiff's previously submitted Exhibit 4 (pages from Defendant's Document Production)):

- Plaintiff and Jane went to her room and started kissing (DEFS 000617);

- Jane was on top of Plaintiff during the encounter (DEFS 000617);

- Jane walked to the bathroom to get a condom in case the kissing led to sex because she was not on birth control (DEFS 000617);

- Jane remembered specific details of the sexual encounter, including digital and anal penetration, repositioning, and her supposed mental state (DEFS 000617);

- Jane was wearing her dress and bra during the encounter (DEFS 000617); and

- Jane supposedly collapsed on the ground as Plaintiff was getting dressed (DEFS 000617).

Pylilo made no effort to reconcile Jane's constantly changing narrative.

Pylilo's interview of Jane's roommate, August Mize, indicates that Jane told a completely different story to Mize the day after her sexual encounter with Plaintiff.  On the day after the incident, Jane told Mize that she "didn't remember [her sexual encounter with Plaintiff] because she was intoxicated but is remembering more now."  DEFS 000618.  In direct contradiction to what she would tell Public Safety the very next day, Jane told Mize that she was so incapacitated that Plaintiff had to drag her on top of him. DEFS 000618.  This is wholly inconsistent with Jane's statement to Public Safety that while she was on top of Plaintiff, she made the conscious decision

to get off of him, walk to her bathroom, retrieve a condom in case the consensual kissing led to sex, and walk back to her bedroom to be with Plaintiff again. DEFS 000617 (*See* Plaintiff's previously submitted Exhibit 4 - pages from Defendant's Document Production).

Pylilo excluded Jane's highly-varying accounts of her sexual encounter with Plaintiff when seeking a warrant for his arrest and during her involvement in his school disciplinary proceeding. However, in her incident report, Pylilo noted multiple times where Plaintiff's story allegedly changed during his April 26, 2017, interview. *See* DEFS 000619 (stating that Plaintiff changed his story regarding whether Jane had a condom or gave him a condom); DEFS 000620 (stating that Plaintiff changed his story when he told Pylilo that Jane was moaning and saying "right there" during the sexual encounter). The supposed inconsistencies highlighted by Pylilo's report notably impact exculpatory evidence indicating that Jane did indeed consent to the sexual activity that occurred on April 23, 2017. Whether Jane (1) went to retrieve a condom and then returned to the bedroom with it in her hand or (2) whether she went to retrieve a condom, returned to her bedroom, gave it to Plaintiff, and said "here take this" simply does not matter – either way, Jane was providing a non-verbal signal to Plaintiff that she consented to sexual intercourse. Pylilo's report also notes that Plaintiff observed Jane take her underwear off prior to their sexual encounter, another non-verbal indication of consent that supports Plaintiff's understanding of the events in question. DEFS 000619. It is unclear exactly what Pylilo is referring to when she says that Plaintiff "changed his story to say that [Jane] was moaning and saying right there." DEFS 000620. No prior notation in Pylilo's report states that Plaintiff said Jane was silent throughout the encounter. Pylilo manufactured this supposed "inconsistency" out of whole cloth. In fact, Pylilo's own report clearly notes the multiple other verbal and non-verbal signals that Jane gave to Plaintiff that indicated that the encounter was consensual. DEFS 000619 (noting that Jane invited Plaintiff

to her apartment, kissed Plaintiff, retrieved a condom, handed him a condom, pulled down her dress to expose her breasts, and took off her underwear prior to digital penetration and intercourse taking place). Moreover, Plaintiff reporting that Jane was at times verbally exhibiting her pleasure with the sexual encounter and actively directing him during the act while at other times was quiet or still is no inconsistency at all. Indeed, it is undisputed that Plaintiff had difficulty putting on the condom (Fallows Dep. at 144:7-144:14) and inserting his penis into Jane (Fallows Dep. at 144:15-144:17; DEFS 000620), an extremely awkward sexual scenario that easily explains Jane's supposed change in behavior during intercourse. In reality, the two instances where Pylilo asserts that Plaintiff "changed his story" are no different from the multiple occasions where Jane "remembered" additional facts, yet Pylilo treated Plaintiff and Jane completely differently.[3] Plaintiff was viewed as not credible for supposed variations in his story that are either minor or not inconsistencies at all. Jane was viewed as providing further detail to a narrative that Pylilo and CCU had already accepted as true. Incredibly, Pylilo's report notes that when Jane was reinterviewed on April 26, 2017, "[Jane] was reassured that she [w]as believed." DEFS 000620.

Based on these facts, a reasonable jury could conclude that Pylilo intended to and indeed did violate Plaintiff's rights to counsel and an impartial trial/hearing; she also withheld/mischaracterized exculpatory evidence from both the State and school which led to Plaintiff suffering restriction of his liberty (false arrest), violation of due process, and being expelled from school. As explained below, all of these violations were of clearly established law, meaning that Pylilo is not entitled to qualified immunity.

---

[3] Pylilo's favoring the female over the male was, unfortunately, indicative of a pattern of behavior that she exhibited throughout her time at CCU. *See* Affidavit of Kenneth W. "Tad" Reed (detailing Pylilo's gender-biased behavior while employed by CCU).

The United States Supreme Court has recognized that an accused is entitled to *Miranda* warnings prior to a custodial interrogation. *Berkemer v. McCarty*, 468 U.S. 420 (1984). Further, "government's failure to turn over material impeachment evidence to the defense [is] a violation of the principles of *Brady* and its progeny." *Jean v. Rice*, 945 F.2d 82, 87 (4th Cir. 1991). The Fourth Circuit has noted that "[a] police officer who withholds exculpatory information from the prosecutor can be held liable under section 1983." *Goodwin v. Metts*, 885 F.2d 157, 162 (4th Cir. 1989). *Miranda* and *Brady* are amongst the most well-known cases in American jurisprudence. Any officer would understand that *Miranda* warnings were required prior to interrogation of Plaintiff, that exculpatory evidence must be turned over to the State and school, and that investigations must possess integrity. In this case, the Court does not have to guess what a reasonable officer should know, as her own supervising officer witnessing her conduct reprimanded Pylilo for consistent anti-male biased investigatory practices. See previously submitted Affidavit of Tad Reed. Regardless, it is clear that an officer such as Pylilo – who has worked at multiple police departments for two decades – would know that her behavior was violating Plaintiff's clearly established constitutional rights.

In rendering its decision, the Court cannot escape the truth that on the night in question, Jane Doe presented Plaintiff with a condom and said, "you are going to need this." This evidence is tantamount to consent. The Horry County Solicitor's Office agreed – dismissing the case upon discovering this undeniable truth and discovering Pylilo had, yet again, misrepresented facts. Officer Pylilo hid this bombshell misleading the court to obtain an arrest warrant and tarnishing the CCU administrative investigation and proceeding. *See Dennis v. City of Philadelphia*, 19 F.4th 279, 290 (3d Cir. 2020) (rejecting qualified immunity defense because "constitutional rule that framing criminal defendants through use of fabricated evidence, including false or perjured

testimony, violates their constitutional rights applies with such obvious clarity."). Pylilo made intentional decisions to undermine Plaintiff's rights to further her own bias and self-interest. This is the type of obvious misconduct that is not entitled to be shielded as "qualified immunity does not protect knowing violation[s] of the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). Accordingly, Plaintiff's 1983 claims against Pylilo must proceed to trial.

   B. *Overton*

   Overton directed the investigation and administrative prosecution of Plaintiff. DEF 000789. Overton's misconduct includes the following acts: failing to interview/present Plaintiff's witnesses during the hearing; failing to allow Plaintiff an attorney at the hearing; preventing Plaintiff from recording the hearing; not recording the hearing or failing to maintain the recording (Fallows Dep. at 134: 3-6) and [DEFS 000789, DEFS 000799]; ignoring exculpatory evidence; questioning Plaintiff in a hostile fashion; not providing Plaintiff with exculpatory evidence; and in slanting all matters in favor of Jane Doe. Overton's misconduct denied Plaintiff's Fourteenth Amendment right to due process. 34 C.F.R. § 106.8(b); *see also* 34 C.F.R. § 668.46(k)(2)(i) (providing that a proceeding which arises from an allegation of dating violence, domestic violence, sexual assault, or stalking must "[i]nlcude a prompt, fair, and impartial process from the initial investigation to the final result.")

   Overton's job was to know what process both accused and alleged victims were entitled to and to impart such fairness into the university disciplinary process. CCU promises its students such fairness. **CCU Student Code of Conduct**. Contrary to the school's declaration of fairness, Overton behaved in ways which ensured the decision-makers would rule against Plaintiff. For instance, Overton only procured Jane Doe witnesses. Plaintiff identified witnesses to Overton which would have corroborated the following key facts: (1) Jane Doe's sexually suggestive

conduct toward Plaintiff on the night in question; (2) Plaintiff's virginity; and (3) Jane Doe's experience. These facts speak to consent but are also important because they corroborate Plaintiff's recollection of the evening (which would have served to bolster his credibility before the decision-maker). Despite repeated efforts to have Overton interview Plaintiff's witnesses, Overton made no effort to collect evidence from them. Contrarily, Overton interviewed Jane Doe witnesses, and arranged for their attendance at the final hearing.

Evidencing his bias against males, at the hearing, Overton took a soft supportive approach when questioning Jane Doe leading her testimony to support the allegations against Plaintiff; but took a hostile disapproving approach with Plaintiff preventing Plaintiff from testifying in fullness. Overton's conduct ensured that the decision-makers were provided a lopsided anti-male/Fallows perspective of events – very much in keeping with Pylilo's behavior.

Overton also failed to provide Plaintiff with impeachment information related to Pylilo. It has been established that Pylilo had been reprimanded by CCU for allowing her anti-male bias to impact her investigatory process. Overton was responsible for providing relevant information to Plaintiff, and the decision-makers and withheld Pylilo's bias from Plaintiff and the decision-makers. The Fourth Circuit has noted that "[a] police officer who withholds exculpatory information from the prosecutor can be held liable under section 1983." *Goodwin v. Metts*, 885 F.2d 157, 162 (4th Cir. 1989).[4] It is easy to conclude that there would have been a different outcome at the final hearing had Plaintiff's witnesses been included in the report, and if the tribunal was afforded the truth about the manner in which Pylilo investigates/reports accusations of rape involving male suspects.

---

[4] Plaintiff recognizes that a school disciplinary proceeding is not the same as a criminal proceeding, but the Fourth Circuit has recognized a student's right to due process.

At the disciplinary hearing, Plaintiff informed Overton that Plaintiff would be recording the hearing.  Overton would not allow Plaintiff to record the hearing. Overton promised Plaintiff there would be a recording the hearing, and that Plaintiff would be able to obtain a copy of it. After the hearing, Plaintiff sought a copy of the recording, but Overton could not provide it (Fallows Dep. at 134: 3-6) depriving Plaintiff of a meaningful appeal as well as evidence to support his Title IX, and 1983 claims.[5]  Like a spoilation charge to a jury, the Court should consider that Overton's failure to maintain a record of the hearing indicates the recording would have favored Plaintiff. A jury could infer from the facts and circumstances surrounding the investigation and hearing that Overton shared the same bias as Pylilo.  Of course, this is not the first time Overton has been sued for violating a student's right to due process. There is, at the very least, a question of fact as to Overton's intent, and the Fourth Circuit has held that "[d]ismissal" "remains improper so long as the officers' mental state remains genuinely in issue." *Thorpe v. Clarke*, 37 F.4th 926 (4th Cir. 2022).

In determining whether Overton is entitled to qualified immunity, the inquiry is whether an official at a state university would reasonably know that the conduct described above violated Plaintiff's clearly established right to due process and to be free from sexual discrimination.  Title IX's core purpose is to constrain public schools from denying students the benefits of education because of sexual discrimination.  20 U.S.C. § 1681(a).  The Fourteenth Amendment, enforced by way of Section 1983, works to constrain the state from violating individual rights. *Mitchum v. Foster*, 407 U.S. 225, 242 (1972) ("The very purpose of Section 1983 [is] to interpose the federal courts between the State and the people, as guardians of the people's federal rights—to protect the

---

[5] This was a precursor of things to come.  No recording – no problem for CCU.  Conceal a relevant report showing Pylilo's bias – no problem for defendants.  After this case, defendants will have no reason to ever conduct themselves faithfully in any matter…hearing for a student or discovery for a civil case.

people from unconstitutional action under color of state law.")   "Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, the minimal requirements of the [Due Process] Clause must be satisfied."  *Goss v. Lopez*, 419 U.S. 565 (1975) (quoting *Wisconsin v. Constantineau*, 400 U.S. 433, 400 U.S. 437 (1971)).  It is well established that "Title IX bars the imposition of university discipline where gender is a motivating factor in the decision to discipline."  *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2nd Cir. 1994).  Finally, it is clearly established that due process requires notice, an opportunity to be heard, and an impartial process.  Based on the foregoing, Plaintiff's claims against Overton must go to a jury.

C.    Recent Fourth Circuit Jurisprudence

Judge Floyd recently authored an opinion, *Thorpe v. Clarke*, 37 F.4th 926 (4th Cir. 2022), which again characterized the soul of qualified immunity – "fair notice."  *Thorpe*, 37 F.4th at 934 (citing *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)).   In *Thorpe*, the Fourth Circuit states that qualified immunity "shields an officer from suit when she makes a decision that, even if constitutionally deficient, misapprehends the law governing the circumstances she confronted." *Thorpe*, 37 F.4th at 934 (internal quotations and citations omitted). The Fourth Circuit also importantly explained that "this qualified immunity extends only as far as the 'interest it protects.'" *Thorpe*, 37 F.4th at 934 (quoting *Smith v. Wade*, 461 U.S. 30, 55 (1983)).  In the context of this case, there is no societal interest in ignoring *Miranda* and *Brady* to arrest an innocent man.  Further, there is no societal interest in depriving students of an impartial hearing.  As a result, Pylilo and Overton, both of whom acted beyond their scopes of authority, have no valid qualified immunity defense.

**CONCLUSION**

Based on the foregoing, Plaintiff respectfully requests a ruling in his favor denying summary judgment as Plaintiff's Section 1983 claims against Defendant Michelyn Pylilo and Defendant Travis E. Overton.

**RESPECTFULLY SUBMITTED,**

**THE BRITTAIN LAW FIRM, P.A.**

By: /s/ *A. Preston Brittain*
    Thomas C. Brittain, Esquire (Fed ID #04920)
    A. Preston Brittain, Esquire (Fed ID # 10408)
    Mary Madison B. Langway (Fed ID # 10684)
    4614 Oleander Drive
    Myrtle Beach, SC 29577
    843-449-8562
    843-497-6124 (fax)
    tommyb@brittainlawfirm.com
    preston@brittainlawfirm.com
    marymadison@brittainlawfirm.com
            *-and-*

**WARSHAW BURSTEIN, LLP**

By: /s/ *Kimberly C. Lau*
    Kimberly C. Lau, Esq.
    James E. Figliozzi, Esq.
    575 Lexington Avenue
    New York, New York 10022
    (212) 984-7709
    klau@wbny.com
    jfigliozzi@wbny.com
    *Attorneys for Plaintiff*

June 26, 2023