# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# FLORENCE DIVISION

| | |
|---|---|
| Ralph John ("Trey") Fallows, III, )<br>)<br>    Plaintiff, )<br>)<br>v. )<br>)<br>Coastal Carolina University, Michelyn )<br>Pylilo, individually, and Travis E. )<br>Overton, individually, )<br>)<br>    Defendants. )<br>_____ ) | CASE NO. 4:19-cv-01182-JD<br><br><br>**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO ALTER OR AMEND THE ORDER DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

**TO:    THE HONORABLE COURT and ABOVE-NAMED DEFENDANTS:**

## INTRODUCTION

Defendants seek the Court to alter or amend its order denying in part Defendants' motion for summary judgment. In the Order, the Court granted Defendants' Motion with regard to Plaintiff's Title IX claim against Coastal Carolina University. Defendants argue that their original motion for summary judgment adequately sought dismissal of Plaintiff's 1983 claims.

Prior to Defendants filing the motion to alter judgment, and at the request of the Court, Plaintiff filed a memorandum supporting his Section 1983 claims, which also addressed Plaintiff's position that Defendants should not be entitled to consideration of summary judgment of those claims.

Defendants mistakenly rely upon Rule 59(e) to summon the Court to alter its judgment denying summary judgment of Plaintiff's 1983 claims. The Fourth Circuit has identified three instances where a district court may amend an earlier judgment: (1) an intervening change in controlling law; (2) new evidence not available at trial; or (3) to correct for a clear error of law or prevent manifest injustice, *Pacific Ins. Co. v. Am. Nat'l Fire Ins. Co.*, 148 F.3d 396, 403 (4th Cir.

1998). None of those instances apply here. Defendants' motion is precisely what the Fourth Circuit disallows, "relitigate[ing] old matters, rais[ing] arguments or present[ing] evidence that could have been raised prior to the entry of judgment. *Pac. Inc. Co.*, 148 F.3d at 403.

## ARGUMENT

I. **The Court correctly determined that Defendants did not properly address Plaintiff's Section 1983 claims pursuant to the requirements of Rule 56.**

The Court's Summary Judgment Order correctly sets forth that "Defendants conclusory assertion that [Plaintiff] has no evidence is insufficient to discharge their Rule 56 burden of production based on the record before the Court." Wai Man Tom, 980 F.3d at 1037. Under Rule 56 (a), "the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The party seeking summary judgment bears the "initial responsibility of informing the district court of the basis for its motion" and identifying sections of the pleadings and evidence that demonstrate the absence of genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Defendant's initial motion for summary judgment fails to conform with their <u>responsibility</u> to <u>inform the district court of the basis for their motion</u>. Further, Defendants failed to identify pleadings and evidence that demonstrate the absence of genuine issue of material fact.

II. **Defendants motion contradicts intent of Rule 59(e).**

In Defendants' motion to alter or amend, Defendants' concede that their original motion for summary judgment failed to name the constitutional amendments cited in Plaintiff's complaint. After conceding a pen-ultimate issue, Defendants then make arguments which could have been made in their original motion for summary judgment. This type of re-litigation maneuver is denounced by the Fourth Circuit in *Pacific Ins. Co. v. Am. Nat'l Fire Ins. Co.*, 148 F.3d 396, (4th Cir. 1998). "In general, reconsideration of a judgment after its entry is an extraordinary remedy

which should be used sparingly." *TFWS, Inc. v. Franchot*, 572 F.3d 186, 194 (4th Cir. 2009) (quoting *Bellsouth Telesensor v. Info. Sys. & Networks Corp.*, Nos. 92-2355, 92-2437, 1995 WL 520978 at *5 n.6 (4th Cir. Sept. 5, 1995). Defendants attempt to squeeze their motion into an instance of "clear error or manifest injustice" but neither apply. There is no clear error the Court's interpretation of Defendants responsibilities to meet their initial Rule 56 burden. Likewise, there is no manifest injustice preventing Defendants from now raising arguments which could have been raised in their original brief. When a party seeks alteration of a judgment because of an alleged error under the third prong, it must be exceedingly clear. "Where a party seeks reconsideration on the basis of clear error, the earlier decision cannot be just maybe or probably wrong; it must…strike us as wrong with the force of a five-week old, unrefrigerated dead fish." *Id*. The Court made no errors in denying summary judgment on the basis of Defendants' failure to meet their initial burden under Rule 56, and there is no manifest injustice.

Because there is no clear error or manifest injustice, the Court need not consider the additional arguments raised by Defendants, which include their effort to establish facts that could have been argued originally.[1] Like Plaintiff did in its response to Defendants motion for summary judgment, Plaintiff includes facts/evidence which support its Section 1983 claims but only in an abundance of caution.

### III.     FACTS SUPPORTING PLAINTIFF'S 1983 CLAIMS

*Pylilo*

Pylilo's investigation of Plaintiff began with a lie. Tricked into believing he was helping with a phone search, Plaintiff showed up to assist Public Safety. From there, Pylilo proceeded to

---

[1] Considering Defendants withheld (and continue to) relevant evidence, Plaintiff finds it shocking Defendants' could even muster up the courage to use the term "manifest injustice."

interrogate Plaintiff without reading him his *Miranda* rights or advising him that he could have counsel before speaking with her about the accusations.

It continues, as Pylilo's investigation is a lopsided anti-male warlock-hunt. Pylilo ignored the inconsistencies of Jane Doe's ever-changing version of events and harped upon the minor clarifications that Plaintiff provided regarding his recollection of the events in question. For example, on April 23, 2017, the day after the sexual encounter, Jane claimed that she did not remember all the details of her sexual encounter with Plaintiff. DEFS 000615. In fact, during her interview with Pylilo, Jane provided a conflicting narrative of her encounter with Plaintiff. DEFS 000615. At first, she told Pylilo "she doesn't recall much but said after her date had sex with her she felt something wet near her privates." DEFS 000615. Directly contradicting the claim that she "doesn't recall much," Jane told Pylilo that "the sex was extremely painful and forceful." DEFS 000615. Later in that same interview, she offered the additional contradictory statement that "the last thing she remembered was sitting in her date's car at Lackey Chapel," indicating that she did not recall **any** aspect of the sexual encounter with Plaintiff. DEFS 000615. She also told Pylilo "that she was under the influence of alcohol and that if she was sober she would not have wanted to have sex." DEFS 000615 (DEFS 000615 has been previously submitted under seal).

Two days later, on April 25, 2017, Jane Doe went to the Public Safety office and provided an extremely detailed accounting of her sexual encounter with Plaintiff including the following additional facts (*see* Plaintiff's previously submitted Exhibit 4 (pages from Defendant's Document Production)):

- Plaintiff and Jane went to her room and started kissing (DEFS 000617);
- Jane was on top of Plaintiff during the encounter (DEFS 000617);

Page | 4

- Jane walked to the bathroom to get a condom in case the kissing led to sex because she was not on birth control (DEFS 000617);

- Jane remembered specific details of the sexual encounter, including digital and anal penetration, repositioning, and her supposed mental state (DEFS 000617);

- Jane was wearing her dress and bra during the encounter (DEFS 000617); and

- Jane supposedly collapsed on the ground as Plaintiff was getting dressed (DEFS 000617).

Pylilo made no effort to reconcile Jane's constantly changing narrative. (DEFS 000617 has been previously submitted under seal).

Pylilo's interview of Jane's roommate, August Mize, indicates that Jane told a completely different story to Mize the day after her sexual encounter with Plaintiff. On the day after the incident, Jane told Mize that she "didn't remember [her sexual encounter with Plaintiff] because she was intoxicated but is remembering more now." DEFS 000618. In direct contradiction to what she would tell Public Safety the very next day, Jane told Mize that she was so incapacitated that Plaintiff had to drag her on top of him. DEFS 000618. (DEFS 000618 has been previously submitted under seal). This is wholly inconsistent with Jane's statement to Public Safety that while she was on top of Plaintiff, she made the conscious decision to get off of him, walk to her bathroom, retrieve a condom in case the consensual kissing led to sex, and walk back to her bedroom to be with Plaintiff again. DEFS 000617 (also *See* Plaintiff's previously submitted Exhibit 4 - pages from Defendant's Document Production).

Pylilo excluded Jane's highly-varying accounts of her sexual encounter with Plaintiff when seeking a warrant for his arrest and during her involvement in his school disciplinary proceeding. However, in her incident report, Pylilo noted multiple times where Plaintiff's story allegedly changed during his April 26, 2017, interview. *See* DEFS 000619 (stating that Plaintiff changed

his story regarding whether Jane had a condom or gave him a condom); DEFS 000620 (stating that Plaintiff changed his story when he told Pylilo that Jane was moaning and saying "right there" during the sexual encounter). The supposed inconsistencies highlighted by Pylilo's report notably impact exculpatory evidence indicating that Jane did indeed consent to the sexual activity that occurred on April 23, 2017. Whether Jane (1) went to retrieve a condom and then returned to the bedroom with it in her hand or (2) whether she went to retrieve a condom, returned to her bedroom, gave it to Plaintiff, and said "here take this" simply does not matter – either way, Jane was providing a non-verbal signal to Plaintiff that she consented to sexual intercourse. Pylilo's report also notes that Plaintiff observed Jane take her underwear off prior to their sexual encounter, another non-verbal indication of consent that supports Plaintiff's understanding of the events in question. DEFS 000619. It is unclear exactly what Pylilo is referring to when she says that Plaintiff "changed his story to say that [Jane] was moaning and saying right there." DEFS 000620. No prior notation in Pylilo's report states that Plaintiff said Jane was silent throughout the encounter. Pylilo manufactured this supposed "inconsistency" out of whole cloth. In fact, Pylilo's own report clearly notes the multiple other verbal and non-verbal signals that Jane gave to Plaintiff that indicated that the encounter was consensual. DEFS 000619 (noting that Jane invited Plaintiff to her apartment, kissed Plaintiff, retrieved a condom, handed him a condom, pulled down her dress to expose her breasts, and took off her underwear prior to digital penetration and intercourse taking place). Moreover, Plaintiff reporting that Jane was at times verbally exhibiting her pleasure with the sexual encounter and actively directing him during the act while at other times was quiet or still is no inconsistency at all. Indeed, it is undisputed that Plaintiff had difficulty putting on the condom (Fallows Dep. at 144:7-144:14) and inserting his penis into Jane (Fallows Dep. at 144:15-144:17; DEFS 000620), an extremely awkward sexual scenario that easily explains Jane's

supposed change in behavior during intercourse. In reality, the two instances where Pylilo asserts that Plaintiff "changed his story" are no different from the multiple occasions where Jane "remembered" additional facts, yet Pylilo treated Plaintiff and Jane completely differently.[2] Plaintiff was viewed as not credible for supposed variations in his story that are either minor or not inconsistencies at all. Jane was viewed as providing further detail to a narrative that Pylilo and CCU had already accepted as true. Incredibly, Pylilo's report notes that when Jane was reinterviewed on April 26, 2017, "[Jane] was reassured that she [w]as believed." DEFS 000620. (Fallows Dep. at 144:15-144:17 previously filed under seal). (DEFS 000619 and DEFS 000620 have been previously submitted under seal).

Based on these facts, a reasonable jury could conclude that Pylilo intended to and indeed did violate Plaintiff's rights to counsel and an impartial trial/hearing; she also withheld/mischaracterized exculpatory evidence from both the State and school which led to Plaintiff suffering restriction of his liberty (false arrest), violation of due process, and being expelled from school. As explained below, all of these violations were of clearly established law, meaning that Pylilo is not entitled to qualified immunity.

The United States Supreme Court has recognized that an accused is entitled to *Miranda* warnings prior to a custodial interrogation. *Berkemer v. McCarty*, 468 U.S. 420 (1984). Further, "government's failure to turn over material impeachment evidence to the defense [is] a violation of the principles of *Brady* and its progeny." *Jean v. Rice*, 945 F.2d 82, 87 (4th Cir. 1991). The Fourth Circuit has noted that "[a] police officer who withholds exculpatory information from the prosecutor can be held liable under section 1983." *Goodwin v. Metts*, 885 F.2d 157, 162 (4th Cir.

---

[2] Pylilo's favoring the female over the male was, unfortunately, indicative of a pattern of behavior that she exhibited throughout her time at CCU. *See* Affidavit of Kenneth W. "Tad" Reed (detailing Pylilo's gender-biased behavior while employed by CCU).

1989). *Miranda* and *Brady* are amongst the most well-known cases in American jurisprudence. Any officer would understand that *Miranda* warnings were required prior to interrogation of Plaintiff, that exculpatory evidence must be turned over to the State and school, and that investigations must possess integrity. In this case, the Court does not have to guess what a reasonable officer should know, as her own supervising officer witnessing her conduct reprimanded Pylilo for consistent anti-male biased investigatory practices. See previously submitted Affidavit of Tad Reed. Regardless, it is clear that an officer such as Pylilo – who has worked at multiple police departments for two decades – would know that her behavior was violating Plaintiff's clearly established constitutional rights.

In rendering its decision, the Court cannot escape the truth that on the night in question, Jane Doe presented Plaintiff with a condom and said, "you are going to need this." This evidence is tantamount to consent. The Horry County Solicitor's Office agreed – dismissing the case upon discovering this undeniable truth and discovering Pylilo had, yet again, misrepresented facts. Officer Pylilo hid this bombshell misleading the court to obtain an arrest warrant and tarnishing the CCU administrative investigation and proceeding. *See Dennis v. City of Philadelphia*, 19 F.4th 279, 290 (3d Cir. 2020) (rejecting qualified immunity defense because "constitutional rule that framing criminal defendants through use of fabricated evidence, including false or perjured testimony, violates their constitutional rights applies with such obvious clarity."). Pylilo made intentional decisions to undermine Plaintiff's rights to further her own bias and self-interest.[3]

*Dean Overton*

---

[3] For these reasons, she is also not entitled to qualified immunity. Of course, at this point, it is exceedingly clear that Defendants have no interest in asserting qualified immunity – having failed to assert it yet again in their motion to alter or amend.

Overton directed the investigation and administrative prosecution of Plaintiff. DEF 000789. (DEF 000789 has been previously submitted under seal).

Overton's misconduct includes the following acts: failing to interview/present Plaintiff's witnesses during the hearing; failing to allow Plaintiff an attorney at the hearing; preventing Plaintiff from recording the hearing; not recording the hearing or failing to maintain the recording (Fallows Dep. at 134: 3-6) and [DEFS 000789, DEFS 000799]; ignoring exculpatory evidence; questioning Plaintiff in a hostile fashion; not providing Plaintiff with exculpatory evidence; and in slanting all matters in favor of Jane Doe. Overton's misconduct denied Plaintiff's Fourteenth Amendment right to due process. 34 C.F.R. § 106.8(b); *see also* 34 C.F.R. § 668.46(k)(2)(i) (providing that a proceeding which arises from an allegation of dating violence, domestic violence, sexual assault, or stalking must "[i]nlcude a prompt, fair, and impartial process from the initial investigation to the final result."). (Fallows Dep. at 134: 3-6) and [DEFS 000789, DEFS 000799] have been previously submitted under seal).

Overton's job was to know what process both accused and alleged victims were entitled to and to impart such fairness into the university disciplinary process. CCU promises its students such fairness. **CCU Student Code of Conduct**. Contrary to the school's declaration of fairness, Overton behaved in ways which ensured the decision-makers would rule against Plaintiff. For instance, Overton only procured Jane Doe witnesses. Plaintiff identified witnesses to Overton which would have corroborated the following key facts: (1) Jane Doe's sexually suggestive conduct toward Plaintiff on the night in question; (2) Plaintiff's virginity; and (3) Jane Doe's experience. These facts speak to consent but are also important because they corroborate Plaintiff's recollection of the evening (which would have served to bolster his credibility before the decision-maker). Despite repeated efforts to have Overton interview Plaintiff's witnesses, Overton made

no effort to collect evidence from them. Contrarily, Overton interviewed Jane Doe witnesses, and arranged for their attendance at the final hearing.

Evidencing his bias against males, at the hearing, Overton took a soft supportive approach when questioning Jane Doe leading her testimony to support the allegations against Plaintiff; but took a hostile disapproving approach with Plaintiff preventing Plaintiff from testifying in fullness. Overton's conduct ensured that the decision-makers were provided a lopsided anti-male/Fallows perspective of events – very much in keeping with Pylilo's behavior.

Overton also failed to provide Plaintiff with impeachment information related to Pylilo. It has been established that Pylilo had been reprimanded by CCU for allowing her anti-male bias to impact her investigatory process. Overton was responsible for providing relevant information to Plaintiff, and the decision-makers and withheld Pylilo's bias from Plaintiff and the decision-makers. The Fourth Circuit has noted that "[a] police officer who withholds exculpatory information from the prosecutor can be held liable under section 1983." *Goodwin v. Metts*, 885 F.2d 157, 162 (4th Cir. 1989).[4] It is easy to conclude that there would have been a different outcome at the final hearing had Plaintiff's witnesses been included in the report, and if the tribunal was afforded the truth about the manner in which Pylilo investigates/reports accusations of rape involving male suspects.

At the disciplinary hearing, Plaintiff informed Overton that Plaintiff would be recording the hearing. Overton would not allow Plaintiff to record the hearing. Overton promised Plaintiff there would be a recording of the hearing, and that Plaintiff would be able to obtain a copy of it. After the hearing, Plaintiff sought a copy of the recording, but Overton could not provide it (Fallows Dep. at 134: 3-6) depriving Plaintiff of a meaningful appeal as well as evidence to support

---

[4] Plaintiff recognizes that a school disciplinary proceeding is not the same as a criminal proceeding, but the Fourth Circuit has recognized a student's right to due process.

his Title IX, and 1983 claims.[5] Like a spoilation charge to a jury, the Court should consider that Overton's failure to maintain a record of the hearing indicates the recording would have favored Plaintiff. A jury could infer from the facts and circumstances surrounding the investigation and hearing that Overton shared the same bias as Pylilo. Of course, this is not the first time Overton has been sued for violating a student's right to due process. There is, at the very least, a question of fact as to Overton's intent, and the Fourth Circuit has held that "[d]ismissal" "remains improper so long as the officers' mental state remains genuinely in issue." *Thorpe v. Clarke*, 37 F.4th 926 (4th Cir. 2022).

Title IX's core purpose is to constrain public schools from denying students the benefits of education because of sexual discrimination. 20 U.S.C. § 1681(a). The Fourteenth Amendment, enforced by way of Section 1983, works to constrain the state from violating individual rights. *Mitchum v. Foster*, 407 U.S. 225, 242 (1972) ("The very purpose of Section 1983 [is] to interpose the federal courts between the State and the people, as guardians of the people's federal rights—to protect the people from unconstitutional action under color of state law.") "Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, the minimal requirements of the [Due Process] Clause must be satisfied." *Goss v. Lopez*, 419 U.S. 565 (1975) (quoting *Wisconsin v. Constantineau*, 400 U.S. 433, 400 U.S. 437 (1971)). It is well established that "Title IX bars the imposition of university discipline where gender is a motivating factor in the decision to discipline." *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2nd Cir. 1994). Finally, it is clearly established that due process requires notice, an opportunity to be heard,

---

[5] This was a precursor of things to come. No recording – no problem for CCU. Conceal a relevant report showing Pylilo's bias – no problem for defendants. After this case, defendants will have no reason to ever conduct themselves faithfully in any matter…hearing for a student or discovery for a civil case.

and an impartial process. Based on the foregoing, Plaintiff's claims against Overton must go to a jury.

## CONCLUSION

The Court should deny Defendants' motion to alter or amend judgment.

**RESPECTFULLY SUBMITTED,**

**THE BRITTAIN LAW FIRM, P.A.**

By: /s/ *A. Preston Brittain*
Thomas C. Brittain, Esquire (Fed ID #04920)
A. Preston Brittain, Esquire (Fed ID # 10408)
Mary Madison B. Langway (Fed ID # 10684)
4614 Oleander Drive
Myrtle Beach, SC 29577
843-449-8562
843-497-6124 (fax)
tommyb@brittainlawfirm.com
preston@brittainlawfirm.com
marymadison@brittainlawfirm.com
-and-

**WARSHAW BURSTEIN, LLP**

By: /s/ *Kimberly C. Lau*
Kimberly C. Lau, Esq.
James E. Figliozzi, Esq.
575 Lexington Avenue
New York, New York 10022
(212) 984-7709
klau@wbny.com
jfigliozzi@wbny.com
*Attorneys for Plaintiff*

July 31, 2023